# EXHIBIT "B"

Decatur, #500160

STATE OF GEORGIA

COUNTY OF DE KALB

LEASE AGREEMENT

THIS LEASE AGREEMENT ("Lease") is made and entered into this 9th day of July, 2010, by and between ALEXANDRIA VENTURES II, LLC, a Georgia limited liability company ("Landlord"), and FAMILY DOLLAR STORES OF GEORGIA, INC., a Georgia corporation ("Tenant").

W I T N E S S E T H:

In consideration of the covenants set forth in this Lease, to all of which Landlord and Tenant agree, Landlord demises to Tenant, and Tenant leases from Landlord, that certain premises located on the northern side of Snapfinger Road, east of its intersection with Wesley Chapel Road, in the City of Decatur, County of De Kalb, State of Georgia, as shown outlined in bold on Exhibit A - Site Plan, and being more particularly described on "Exhibit H – Outparcel" hereto (the "Property "). Landlord will construct a building that contains 9,180 (90' x 102') square feet (the "Building") and the paved, marked, lighted parking, service and access areas within the Property as shown on Exhibit A - Site Plan; and the Property, the Building and other improvements within the Demised Premises are referred to as the "Demised Premises" under this Lease. As of the date of this Lease, Snapfinger Road is being widened. Exhibit A – Site Plan shows the Shopping Center and Demised Premises as it will exist after the road widening is completed. The Property sits in front of a Shopping Center located to the north of the Property known as Snapfinger Plaza Shopping Center, (hereinafter the "Shopping Center").

Prior to the date Landlord delivers the Demised Premises to Tenant, Landlord will deliver a fully executed and recorded copy of Exhibit I – Easement Agreement

Decatur#500160

("Easement Agreement"). If any changes are made to the form shown in Exhibit I –
Easement Agreement then Landlord will send the changes to the Easement Agreement to
Tenant for review and approval before the date Landlord delivers the Demised Premises
to Tenant. Landlord grants to Tenant all of the parking, access and other rights granted to
Landlord in the Easement Agreement and will, at Landlord's expense, abide by the
Easement Agreement and will enforce the Easement Agreement for the benefit of Tenant.
Tenant will reimburse Landlord for any "Assessments" made under the Easement
Agreement during the term of this Lease. Landlord shall not enter into any amendment of
the Easement Agreement effective during the Term of this Lease, including extension
periods, without the prior written consent of Tenant. Landlord shall promptly send to
Tenant copies of all notices given to Landlord in connection with its rights under the
Easement Agreement, including but not limited to notices issued by the owner of the
Shopping Center.

If Tenant accepts possession of the Demised Premises without the fully signed and
recorded Easement Agreement being delivered to Tenant or with changes to the
Easement Agreement not authorized by Tenant, then Tenant will not be considered to
have waived Landlord's obligation to obtain said Easement Agreement, and Tenant will
have the right anytime thereafter to temporarily suspend its payment (but not accrual) of
rent under this Lease until said Easement Agreement is obtained by Landlord as set forth
above.

Tenant will have and hold the Demised Premises together with all appurtenances,
rights, privileges and easements belonging or appertaining to the Demised Premises, for



Decatur#500160

an initial term commencing as set forth in Paragraph 5 and ending on the 31st day of January 2021.

　　1. <u>RENT</u>.  Tenant will pay to Landlord fixed rent of ████████████████

████████████████████████████████████████████

payable on or before the first day of each month beginning on the rent commencement date set forth in Paragraph 5.  Tenant will not be deemed late in making a fixed rent payment unless Landlord does not receive the payment on or before the tenth day of the month.  In the event that Tenant fails to make its fixed rent payment by the ████ day of the month more than ██████████████████████, and Tenant promptly received notice of each late payment from Landlord, then any subsequent late payment of fixed rent, until Tenant has made its fixed rent payments on a timely basis for a 12 consecutive month period, will incur a late payment charge equal to ██████████████████ amount.

　　1A. <u>CONTINGENCIES</u>.  This Lease is contingent upon the satisfaction of the following matters on or before 12 months after the date this Lease is signed by Landlord and Tenant, (the "contingency date"): (a) Landlord delivering the fully executed and recorded Easement Agreement as set forth in the Witnesseth section above, (b) the road widening along Snapfinger Road being completed to the extent of installation of the permanent curb cuts and paving into the Demised Premises as shown on Exhibit A and permanent relocation of at least 2 lanes of Snapfinger Road that are immediately accessible to the Demised Premises through such curb cuts, and (c) Post Office Drive being paved and dedicated as a public right of way extending from Snapfinger Road to the boundary of the Shopping Center, across which the Demised Premises enjoys rights

Decatur#500160

of access under the Easement Agreement. Landlord will use its best efforts to satisfy the contingencies on or before the contingency date, and if Landlord has not satisfied the contingencies on or before the contingency date, Tenant will have the right to terminate this Lease by written notice to Landlord at any time prior to the date that the contingencies have been satisfied. Landlord will notify Tenant promptly upon its satisfaction of each of the contingencies.  If this Lease is terminated, then Landlord and Tenant will be released from all obligations hereunder.

2.  COVENANT OF TITLE AND AUTHORITY.  Landlord covenants and warrants that Landlord has full right and lawful authority to enter into this Lease for the full initial term and all extensions; that Landlord owns fee simple title to the  Property; that the Demised Premises are free and clear of all encumbrances that could adversely affect Tenant's rights under this Lease and are free and clear of all mortgages and liens except a first mortgage or deed of trust with Georgia Primary Bank; that there are no recognized environmental conditions associated with the Demised Premises, including any petroleum contamination in the soil or groundwater; that there are no underground storage tanks in the ground of the Demised Premises; that Demised Premises is not listed in any regulatory lists as a contaminated, regulated or possible contaminated site, which are published by federal and state agencies, including but not limited to, National Priority List (NPL), Comprehensive Environmental Response, Compensation and Liability Information Systems (CERCLIS), or Leaking Underground Storage Tanks Sites (LUST); that Landlord will record the Easement Agreement in the Official Public Registry of De Kalb County; that when construction is completed, the Demised Premises will comply with all health, safety and environmental laws, ordinances and regulations and building codes; that to the best

4

Decatur#500160

of Landlord's knowledge there are no laws, ordinances, government requirements or regulations, or zoning or other matters that will restrict limit or prevent the Demised Premises from being used for the retail sale of merchandise typically sold by variety stores, discount stores, dollar stores or variety discount stores; and that there are no title restrictions, restrictive covenants or restrictions in other leases (including leases on the adjacent Shopping Center) or in any easements pertaining to the Demised Premises or the Shopping Center that limit the types of products that may be sold from the Demised Premises.

3.   USE OF PREMISES.   Landlord agrees that the Demised Premises may be used for the conduct of a variety store, discount store, dollar store or variety discount store.

Tenant agrees that there will not be operated in the Demised Premises any restaurant, theater (motion picture or legitimate), health spa, gym or fitness center, skating rink, bingo parlor, bowling alley, or other recreational or entertainment-type business, automobile or motorcycle sales establishment, school or training facility, non-retail or non-service-type activities, or any establishment which sells alcoholic beverages for on-premises consumption, or business or professional offices in excess of 2,000 square feet.

Tenant will not be obligated to continuously occupy or operate a business in the Demised Premises.  Whether or not Tenant is occupying or conducting business in the Demised Premises, Tenant will be responsible for paying the rent and other sums due Landlord under this Lease and for performing Tenant's other obligations subject to and in accordance with the provisions of this Lease.  In the event that no business is conducted

Decatur#500160

in the Demised Premises for six consecutive months for reasons other than strikes, lock-outs, labor troubles, failure of power or other utilities, fire or other casualty, restrictive governmental laws or regulations, riots, insurrection, war or other reason not the fault of Tenant or for any cause beyond Tenant's reasonable control or for remodeling or renovations, then Landlord will have the option, to be exercised if ever within 30 days after the expiration of said six month period, to terminate this Lease upon 30 days' prior written notice to Tenant, provided that if a business is again conducted within the Demised Premises before the expiration of 30 days after Tenant receives such notice, then such termination notice will be void and this Lease will continue.

4. CONSTRUCTION OF PREMISES.

A. DESIGN REQUIREMENTS. Landlord will, at Landlord's expense, (i) construct the paved, marked, lighted parking, service and access areas upon the Demised Premises as shown on Exhibit A - Site Plan, (ii) construct the road signage and other signage as specified in this Lease and (iii) construct for Tenant a retail store building that contains 9,180 (90' x 102') square feet of interior ground floor space. Landlord will develop the Demised Premises so that the Demised Premises will have direct access to the public streets as shown on Exhibit A – Site Plan. Landlord will obtain all necessary driveway and curb cut permits to construct the driveway connections. Landlord will construct the Demised Premises in accordance with Exhibit A and Tenant's standard plans and specifications identified as Plan #2009-02 on Exhibit B-Tenant's Prototype Plan Sheet Index. Landlord represents that Landlord has reviewed a full set of Tenant's Standard plans and specifications designated Plan #2009-02 ("Tenant's Standard Plans"), and that Landlord used that set of Tenant's Standard Plans to determine the cost to

Decatur#500160

construct the Demised Premises.  Prior to applying for site plan approval or building permits, Landlord will prepare and submit to Tenant's Build-To-Suit Project Manager a single package consisting of three copies of a fully engineered site plan, three copies of drawings for Tenant's road signs, and three complete sets of civil and architectural drawings for the Demised Premises incorporating all the requirements of Tenant's Standard Plans.  The engineered site plan, pylon drawing and civil and architectural drawings are collectively called the "Construction Drawings".  As an alternative to submitting three paper sets of the Construction Drawings, Landlord may submit one set electronically in a PDF format.  Landlord's submission of the Construction Drawings to Tenant are for Tenant's files and reference.

If Landlord desires to deviate from Tenant's Standard Plans, then prior to submitting the Construction Drawings to Tenant, Landlord must submit to Tenant's Build-To-Suit Project Manager in writing a specific description of the proposed deviation(s), the reason for the deviation(s), and the substitute design or materials Landlord is proposing.  After reviewing Landlord's proposed deviations, and if necessary, discussing them with Landlord, Tenant's Build-To-Suit Project Manager will accept or reject the proposed deviations.

Landlord will erect and complete the building and all improvements to the Demised Premises in accordance with Exhibit A and Tenant's Standard Plans, subject only to deviations to Tenant's Standard Plans approved by Tenant in writing in accordance with the above described procedure.  Landlord will have full responsibility for ensuring that the Construction Drawings comply with all applicable codes, ordinances and governmental requirements.  In particular, Landlord will ensure that the Demised Premises and all

Decatur#500160

parking, service and access areas  will be designed and constructed in accordance with the Standards for Accessible Design for new construction included in Appendix A to the Title III implementing regulations of the Americans with Disabilities Act of 1990, as amended.  In addition, Landlord will be responsible for completing any work, such as landscaping that is required to be completed due to the fact that the Demised Premises is part of the I-20 Overlay District.  Upon completion of construction, Landlord (either on its own or through its architect, engineer or contractor) will certify that the Demised Premises, including the parking, service and access areas, meet the standards by signing and sending Tenant a certification in the form attached to this Lease as Exhibit C – ADA Certification.  If Landlord fails to comply with the terms of this Paragraph, then Tenant will not be obligated to accept possession of the Demised Premises so long as the Demised Premises does not meet all of the requirements of Exhibit A and Tenant's Standard Plans or does not comply with all applicable codes, ordinances and governmental requirements.

B. <u>CONSTRUCTION SCHEDULING</u>.  Landlord understands that the timely completion of construction is of utmost importance to Tenant.  Accordingly, Landlord agrees to diligently perform the obligations Landlord is to perform under this Paragraph and to keep Tenant informed of Landlord's progress of construction, including pre-construction matters.  In particular, Landlord agrees to provide progress reports to Tenant in the forms attached to this Lease as follows:  Exhibit D-1: Development Status Report, Exhibit D-2: Construction Milestone Status Report and Exhibit D-3: Photo Instructions. Landlord must submit Exhibit D-1 to Tenant's Build-To-Suit Project Manager via e-mail or fax on a weekly basis, no later than 12:00 p.m. Eastern Time on Thursday.  If Landlord fails to submit Exhibit D-1 within the required time frame more than three times during the

Decatur#500160

development phase, then for each time thereafter that Landlord fails to meet the deadline,

Tenant will have the right to deduct ███████ per occurrence from the fixed rent due

pursuant to Paragraph 1 of this Lease.  Exhibit D-2 identifies five construction milestones.

Landlord must submit Exhibits D-2 and D-3 within one week after Landlord completes

each construction milestone.  If Landlord fails to submit Exhibits D-2 and D-3 within the

required time frame, then for each milestone report that is not submitted on a timely basis,

Tenant will have the right to deduct ███████ per occurrence from a fixed rent payment

due pursuant to Paragraph 1 of this Lease.  Tenant's Construction Department will e-mail

the forms for Exhibits D-1 through D-3 to Landlord.  Promptly after this Lease is signed,

Landlord will commence the tasks necessary for Landlord to close on construction

financing and thereafter commence construction, including but not limited to, the tasks set

forth on Exhibit D-1.

Landlord will notify Tenant's Build-To-Suit Project Manager in writing of the date

that Landlord will deliver the Demised Premises to Tenant with all construction

substantially completed (as defined in Paragraph 5) (the "Delivery Date").  Landlord's

notice will be in the form attached as Exhibit E - Delivery Notice.  Landlord must send the

Delivery Notice to Tenant at least 28 days prior to the date Landlord will deliver

possession of the Demised Premises to Tenant.  However, before Landlord sends the

Delivery Notice to Tenant: (1) all driveways, service areas and parking areas and the Post

Office Drive, including the final topcoat, must be fully paved and completed (2) all

necessary utilities must be connected, (including meters) and be operational; (3) Tenant's

building and road signs as specified in this Lease must be installed (including completion

of electrical connections) and be operational; (4) the road widening along Snapfinger

Decatur#500160

Road must be completed; and (5) the Easement Agreement must be fully signed, recorded and delivered to Tenant; and (6) the Reliance Letter must be delivered to Tenant.

Landlord understands that the Delivery Notice will be binding on Landlord and that Tenant will rely on the Delivery Date set forth in the Delivery Notice to begin preparing to open its store.  Tenant's preparations will include ordering store fixtures, buying advertising for Tenant's "grand opening" and hiring employees to open and operate the store.  These preparations involve a substantial time commitment by Tenant's employees as well as significant out-of-pocket expenses.  These internal activities and out-of-pocket expenses will have to be duplicated if the opening of Tenant's store is delayed and rescheduled.  Therefore, if Landlord gives the Delivery Notice to Tenant, but fails to deliver the store with construction substantially completed on or before the Delivery Date stated in the Delivery Notice, then Landlord will pay Tenant ████ as liquidated damages to compensate Tenant for the costs and losses resulting from canceling and rescheduling the opening of Tenant's store, if the opening is actually cancelled and rescheduled.  Landlord agrees that ████ is reasonable compensation to Tenant for costs and losses resulting from delaying the opening of Tenant's store, and that it is not possible to calculate Tenant's exact losses and costs.  If Landlord does not provide the Delivery Notice to Tenant within one year after the date this Lease is signed by Landlord and Tenant, then Tenant will have the right to terminate this Lease.  If Landlord signs this Lease, but fails to make diligent and good faith efforts to construct the store for Tenant within the ████ period, then Tenant may also pursue legal and equitable remedies for breach of this Lease.

Decatur#500160

5. COMPLETION OF CONSTRUCTION, DELIVERY TO TENANT AND
COMMENCEMENT OF TERM AND RENT. After Landlord sends the Delivery Notice,
Tenant's construction representative will visit the Demised Premises on or before the
Delivery Date to perform a final inspection and generate a punch list. Tenant's punch list
procedures are attached as Exhibit D-4 – Punch List Procedures. Construction will be
deemed to be substantially completed (sometimes called "Substantial Completion") on the
date the following conditions have been met: (a) a certificate of occupancy has been
obtained; (b) the road widening along Snapfinger Road has been completed to the extent
set forth in the Contingencies; (c) the improvements required to be performed by
Landlord, including installation of all signage required to be installed by Landlord, have
been completed in accordance with the approved Construction Drawings subject only to
minor punch list items, the non-completion of which will not interfere with the installation of
Tenant's store fixtures or Tenant's opening for business to the public; (d) Post Office
Drive must be paved and completed; and (e) the Easement Agreement must be signed,
recorded and delivered to Tenant. Landlord will diligently proceed to correct and
complete all punch list items. Tenant agrees to accept delivery of the Demised Premises
on the date that the above requirements have been met. However, Tenant will not be
required to accept delivery of the Demised Premises during the period ███████████
███████████ f any years. Upon completion of construction, Landlord will provide to
Tenant the ADA Certification attached as Exhibit C and a certificate of occupancy. The
term will begin on the date Tenant accepts delivery of the Demised Premises.
Notwithstanding anything to the contrary in this Paragraph, in no event will rent
commence before a certificate of occupancy has been provided to Tenant.

11

**Decatur#500160**

If Landlord sends the Delivery Notice to Tenant and delivers the Demised Premises to Tenant with construction Substantially Completed on or before the Delivery Date set forth in the Delivery Notice, and provides the certificate of occupancy, then the fixed rent will begin to accrue on the earlier of (i) 30 days after the Delivery Date, or (ii) the date Tenant opens for business.

If Landlord does not send the Delivery Notice to Tenant, but otherwise completes Landlord's obligations set forth in Paragraph 4, then Tenant will have the right to accept possession of the Demised Premises and open for business, if Tenant is lawfully permitted to open for business.  The fixed rent will begin to accrue ███s after all construction is Substantially Completed and Landlord provides the certificate of occupancy and the ADA Certification.  If Landlord sends the Delivery Notice, but fails to Substantially Complete construction on or before the Delivery Date set forth in the Delivery Notice, then fixed rent will begin to accrue on the date Tenant opens for business, but Tenant will collect the ███ liquidated damages by deducting it from the first payments of fixed rent due Landlord, if the opening was rescheduled.

6. <u>TERM EXTENSIONS</u>.  The term of this Lease will be automatically extended one period at a time for ██ uccessive periods ("extended terms") of ███ each unless Tenant  gives written notice to Landlord canceling the next extended term at least ● days before the extended term is scheduled to begin.  If Tenant gives such notice, then this Lease will expire the day before the extended term is scheduled to begin.  All of the terms, covenants and conditions of this Lease will apply to each extended term except the amount of rent will be as set forth below:



12

Decatur#500160

| EXTENDED TERM | FIXED RENT |
|---|---|
| 1st | ███████████████ |
| 2nd | ███████████████ |
| 3rd | ███████████████ |
| 4th | ██████████████) |
| 5th | ███████████████ |
| 6th | ██████████████ |

For all purposes under this Lease, the phrases "the term of this Lease" and "lease term" will mean the initial term and any extended term that comes into effect.

7. <u>ALTERATIONS BY TENANT</u>.  Tenant will have the right at all times after the date of this Lease to make, at its own expense, any changes, improvements, alterations and additions to the Demised Premises that Tenant desires, except that Tenant will not make any structural alterations or improvements without Landlord's prior written consent, which consent will not be unreasonably withheld or delayed.  Any alterations and improvements made by Tenant will be done in a good and workmanlike manner and in accordance with applicable code requirements.

Tenant agrees to pay promptly when due all charges for labor and materials in connection with any work done by Tenant upon the Demised Premises so that the Demised Premises will not be subject to liens resulting from such labor and materials.  If any mechanic's or other lien is filed against the Demised Premises arising out of any labor or material furnished to Tenant pursuant to a contract with Tenant, then Tenant will cause the lien to be canceled and discharged of record by payment or bond within ███████ after

Decatur#500160

Tenant receives written notice of the lien from Landlord.  Tenant will defend on Landlord's behalf, at Tenant's sole cost and expense, any action, suit or proceeding for the enforcement of any such lien, and Tenant will pay any damages and satisfy and discharge any judgment entered thereon.

8.  <u>FIXTURES</u>.  Tenant will have the right to install on the Demised Premises any fixtures and equipment Tenant desires for the operation of its business.  Tenant will, on termination of this Lease, and may at any time during the lease term, remove from the Demised Premises all shelving, fixtures and equipment that Tenant installed.  Tenant will repair any damage to the Demised Premises caused by Tenant's removal of its shelving, fixtures and equipment.

Tenant agrees that all of Tenant's personal property of every kind or description which may at any time be in the Demised Premises will be at the Tenant's sole risk unless damage thereto is a result of Landlord's failure to perform a covenant or to maintain an area within Landlord's area of maintenance control under this Lease.

9.  <u>UTILITIES</u>.  Utilities means water, sanitary sewer service, natural gas (if available) and electrical service with 3 phase, 400 amp capacity ("Utilities").  Landlord will ensure that the Utilities are properly connected to the Demised Premises, supplied directly by the utility providers and separately metered (no submeters).  Landlord will be responsible for paying any utility charges that accrued prior to the date Tenant accepts delivery of the Demised Premises.  Tenant will pay directly to the utility providers all deposits required to initiate service and all charges for all Utilities used by Tenant in the Demised Premises.  Tenant will have no obligation to pay to Landlord any charges or fees billed to Landlord by any utility provider, except as specifically stated in this Lease.

Decatur#500160

10. <u>DAMAGE AND DESTRUCTION</u>.  If the building or the parking, service or access areas on the Demised Premises are damaged or destroyed by fire or other casualty, then Landlord will promptly, at Landlord's expense, remove all debris and repair, restore or rebuild the Demised Premises so that they will be substantially the same as they were immediately prior to the damage or destruction.  Landlord will not be obligated to restore Tenant's trade fixtures.  Landlord's obligation will include performing all work necessary to cause the Demised Premises to comply with then currently applicable building and fire codes.  Rents and other charges will cease and abate on the date of the damage or destruction in proportion to the area of the Building on the Demised Premises rendered unusable and any rent paid in advance by Tenant will be refunded to Tenant. Rents and other charges will begin to re-accrue upon the earlier of (i) the 30th day after Landlord completes the repair, restoration or rebuilding of the Demised Premises and tenders possession to Tenant, or (ii) the date Tenant reopens for business in the Demised Premises.  If Landlord does not complete the repair, restoration or rebuilding of the Demised Premises within ████████ after the date the damage occurred, then Tenant may, at its option, terminate this Lease.

Should the Shopping Center be damaged or destroyed so that Tenant would not have ingress or egress to and from Post Office Drive, Landlord will use commercially reasonable efforts to cause the owner(s)/tenants of the Shopping Center to repair, restore, or rebuild the so much of the Shopping Center to provide such ingress and egress to post Office Drive.  If Tenant's signs in the Shopping Center are damaged or destroyed or Tenant's #2 Proposed Monument Sign, as defined in Paragraph 15, are damaged and destroyed, then Landlord will repair, restore or rebuild them for Tenant or

15

Decatur#500160

cause the owner of the Shopping Center to do so.  "Destroyed" shall mean physical destruction and not eminent domain.

Notwithstanding the foregoing, if the Demised Premises are so extensively damaged as to require rebuilding and the damage occurs during the last year of the initial term of this Lease or the last year of any extended term, then prior to Landlord's commencement of rebuilding, Landlord may request in writing that Tenant agree to waive its right to cancel this Lease at the end of the then current term so that there will be at least five full calendar years remaining on the lease term.  If Tenant refuses to agree to waive its right to cancel this Lease, or if the damage occurs during the last year of the final extended term, then Landlord will not be obligated to rebuild the Demised Premises, and if Landlord elects not to rebuild, then either Landlord or Tenant may terminate this Lease by giving written notice to the other party.

11.  INSURANCE.  (a) Landlord will obtain and keep in force a commercial property insurance policy covering the Demised Premises for their full replacement cost against loss or damage by perils covered by "Causes of Loss – Special Form" Insurance (Commercial Property Coverage Form ISO CP 10 30), or its equivalent.  Landlord's policy will contain an ordinance and law endorsement and will provide debris removal coverage.

(b) Tenant will, at Tenant's option, obtain and keep in force commercial property insurance covering Tenant's personal property in the Demised Premises for its full replacement cost against loss or damage by perils covered by Causes of Loss – Special Form Insurance (Commercial Property Coverage Form ISO CP 10 30) or its equivalent, or Tenant will assume all risk of loss of its personal property.  Tenant will obtain and keep in force a commercial general liability insurance policy with limits of not less than $▮▮▮

16

Decatur#500160

for each occurrence and $████████ general aggregate insuring Tenant against liability for bodily injury, death and property damage with respect to occurrences in the Demised Premises. The liability insurance carried by Tenant may be provided by a primary policy or a combination of primary and excess or umbrella policies, and will be subject to such deductibles or self insured retentions as Tenant elects in its sole discretion. Landlord will be named as an additional insured under Tenant's liability coverages, but only for claims against Landlord arising out of the acts or omissions of Tenant, or arising out of the manner of Tenant's use of the Demised Premises.

(c) Landlord will require that the owner of the Shopping Center to cause the Tenant to be named as an additional insured under the insurance policy for the parking, service and access areas of the Shopping Center.

(d) Landlord's and Tenant's insurance policies and coverages must be issued by financially responsible insurers that are duly authorized to do business in the state where the Demised Premises are located. Upon written request, Landlord and Tenant will each provide to the other a certificate of insurance from each liability insurer. The certificates of insurance will evidence the required coverages, name Landlord or Tenant, as applicable, as a certificate holder and additional insured and provide that the applicable insurer will endeavor to give not less than ●days' advance written notice to Landlord or Tenant, as the case may be, prior to the effective date of cancellation of the required insurance.

(e) Beginning on the rent commencement date, Tenant will reimburse Landlord for the insurance premium for the insurance Landlord is required to carry by subparagraph (a) of this Paragraph and for rent loss insurance, if carried by Landlord. All premiums will be reasonable and at competitive rates.

Decatur#500160

Notwithstanding the foregoing, for the first insurance policy period o███ull consecutive months beginning after the commencement of the term of this Lease, Tenant's reimbursement will not exceed ███████he amount of the premium to be reimbursed by Tenant  will be reduced on a per diem basis for any partial lease years.

Landlord will furnish to Tenant a copy of the premium and the paid invoice annually.  Upon Tenant's written request, Landlord will furnish any other information Tenant may reasonably require. In no event will Tenant be responsible for reimbursing Landlord for any insurance premium unless Tenant has received the required statement and documentation from Landlord within ██████s after the earlier of the date Landlord paid the premium or the date the premium was due and payable.  Tenant will reimburse Landlord annually within ██████s after receipt of the request for payment and required documentation.

(f) Subject to Paragraph 20, <u>MUTUAL WAIVER</u> (which pertains to first party real or personal property losses), from and after the date possession of the Demised Premises is delivered to Tenant, and thereafter during the term of this Lease, Tenant will defend, indemnify and save Landlord harmless from any claim, liability, loss, cost or expense (including reasonable attorneys fees and litigation expenses) on account of any injury or death to any third person, or damage to any third person's property, occurring in the Demised Premises, or arising out of Tenant's failure to perform its obligations under this Lease, provided that the injury, death, or property damage was not caused or contributed to by the negligent or intentional acts or omissions of Landlord or its agents or employees. The obligations of Tenant set forth in this Paragraph will survive the expiration or termination of this Lease until they are fully satisfied.

18

Decatur#500160

    12. <u>MAINTENANCE AND REPAIRS</u>.  Landlord will remedy any defect in workmanship, materials or equipment furnished by Landlord pursuant to Paragraph 4 of this Lease provided Tenant notifies Landlord of the defect within 12 months after the rent commencement date.  Landlord will maintain and repair and replace when necessary all exterior portions of the building constituting part of the Demised Premises, including the roof, exterior walls, canopy, gutters, downspouts, and also all structural portions of the building constituting part of the Demised Premises whether interior or exterior.  Landlord will make all repairs and replacements to any portion of the building constituting part of the Demised Premises where the damage or loss is caused by casualties or perils insurable under the insurance that Landlord is required to carry pursuant to Paragraph 11(a).  Landlord will also be responsible for making all repairs made necessary to the Demised Premises by the settling of the building, all repairs to the interior of the building made necessary by Landlord's failure to maintain the exterior of the building, and all repairs to exterior (including under slab) plumbing and electrical lines.  Landlord will keep the parking, service and access areas (and other exterior areas, if any) of the Demised Premises maintained, and in a good state of repair and properly lighted.  Tenant will be responsible for maintaining the existing landscaping including mowing; snow plowing, removing trash and debris from the parking area and landscaped areas; restriping the parking area; and repairing parking area lights upon the Demised Premises.

    Tenant will maintain and repair all interior, non-structural portions of the building except for repairs Landlord is required to make.  Except for damage or losses caused by casualties or perils insurable under the insurance that Landlord is required to carry per Paragraph 11(a), Tenant will maintain, repair and replace the heating and air conditioning

19

Decatur#500160

systems, but Tenant will not be required to replace any major components of the heating and air conditioning systems.

Neither Landlord nor Tenant will be responsible for repairs or replacements that are the direct result of the negligence of the other party unless the repairs or replacements are covered by insurance or required by this Lease to be covered by insurance; provided, if the party charged with negligence disputes that it negligently caused the condition needing the repair or replacement, then the party responsible for making the repair or replacement in the absence of the other party's negligence will make the repair or replacement, but will have the right to recover the reasonable costs of the repair or replacement from the negligent party unless the loss is covered or required to be covered by insurance.

13.  TAXES.  Landlord will timely pay all taxes, assessments and other charges that may be levied, assessed or charged against the Demised Premises, and Landlord will make all payments required to be made under the terms of any mortgage or deed of trust that is now or later becomes a lien on the Demised Premises.

Tenant will timely pay all operating license fees for the conduct of its business, and ad valorem taxes levied upon its trade fixtures, inventory and other personal property. Beginning on the rent commencement date, Tenant will reimburse Landlord for real estate taxes on the Demised Premises.  Notwithstanding the foregoing, for the first year after Tenant opens for business, Tenant's reimbursement for real estate taxes will not exceed ███████████ amount of the real estate taxes to be reimbursed by Tenant  will be reduced on a per diem basis for partial lease years.



Decatur#500160

Landlord will provide Tenant with a copy of the tax bill with evidence of Landlord's payment for each year beginning with the year in which the lease term commences and any other necessary information Tenant may reasonably require.  Tenant will reimburse Landlord annually within ███████ after Tenant's receipt of the request and required documentation.  In no event will Tenant be responsible for reimbursing Landlord for any real estate taxes unless Tenant has received a copy of the tax bill with evidence of payment and a written request for reimbursement from Landlord along with the required documentation within ███████ after the last day the taxes were due without penalty or interest.

After receiving notification of any planned increase in the assessed value of the Demised Premises, Landlord agrees to notify Tenant in writing at least ██████ before the last day to contest the increase at the lowest level administrative proceeding.  Tenant will have the right to contest, by appropriate proceedings, in Landlord's or Tenant's name, the validity or amount of the increase.  Landlord agrees to cooperate with Tenant in contesting the increase above ████████  If Landlord fails to give written notice of the increase to Tenant within the required time period, and the increase is greater than seven percent and Landlord does not elect to contest the increase, then Tenant will not be responsible for reimbursing Landlord for the tax increase above ████ If any state or local real estate tax exemption or abatement programs exist during the first year of the lease term, then Landlord will notify Tenant.  Landlord will cooperate with Tenant to timely apply for such exemptions or abatements, including exemptions or abatements that provide relief from increases in real estate taxes resulting from an increased assessment of the Demised Premises due to construction of the Demised Premises by Landlord prior to the

Decatur#500160

rent commencement date.  Tenant will receive its proportionate share of the benefit of any exemption or abatement.

14.  <u>DEFAULT BY LANDLORD</u>.  If Landlord fails to perform any obligation to be performed by Landlord pursuant to this Lease, including any payment that Landlord has agreed to make, and (except in an emergency) Landlord does not cure the failure within ███ ays after Tenant gives written notice of the failure to Landlord, then Tenant may, in Tenant's sole discretion, perform the obligation or make the payment as Landlord's agent. If roof leaks occur more than two times in any ███ onth period, and Tenant has notified Landlord in writing after each of the first two occurrences, then whether or not Landlord has made repairs after the previously reported leaks, Tenant will have the right to perform any required repairs or replacement.  Tenant shall send Landlord a statement or invoice showing the full amount of any costs and expenses incurred or payment made by Tenant pursuant to this Paragraph.  Landlord shall reimburse Tenant within ● days after the date Landlord receives Tenant's statement or invoice.  If Tenant does not receive Landlord's reimbursement within such ███ ay period then, Tenant will have the right to deduct all amounts expended by Tenant pursuant to this Paragraph, together with interest from the date of payment at the prime rate charged by Bank of America, its successors or assigns, plus two percent, without being in default, out of rents then due or thereafter coming due. In the event of an emergency, including (i) any roof leak, (ii) any damage to the building constituting part of the Demised Premises that compromises the security of the Demised Premises or (iii) any event, including action by governmental authorities, that would require Tenant to close its business, Tenant will give such notice to Landlord as is reasonable under the circumstances, including notice by e-mail, fax or telephone.  The

22

Decatur#500160

rights granted in this Paragraph will not release Landlord from any obligation to perform

any of the covenants to be performed by Landlord under this Lease and will be in addition

to any other rights Tenant may have by reason of any default by Landlord.  Landlord has

the right to dispute any deduction made by Tenant, and may bring suit to recover all sums

withheld.  Landlord will be entitled to interest on all sums wrongfully withheld by Tenant at

the interest rate set forth in this Paragraph, but Tenant will not be in default for failure to

pay any sums withheld unless Tenant fails to pay the amount of any final judgment in

Landlord's favor within ███ days after the judgment is entered.

15.  <u>SIGNS</u>.  Landlord will erect for Tenant two Building signs, one facing Wesley

Chapel Road and one facing Snapfinger Road and five road signs as shown on Exhibit A

– Site Plan.  The road signs will be constructed as generally depicted on Exhibit A – Site

Plan, and Tenant's signs on such road signs will bear Tenant's standard graphics and

colors.  Tenant's signs will be placed in the top tenant positions on each of the multi-

tenant signs as shown on Exhibit A – Site Plan.  Not all of the signs to be constructed as

depicted on Exhibit A – Site Plan are necessarily or fully depicted on Exhibit F-1.

Therefore, prior to permitting for and erecting these signs, Landlord will submit artwork of

Tenant's signage, setting forth details that include, but are not limited to, size, color and

graphics, for Tenant's written approval.  Landlord will comply with the requirements of

Tenant's sign program as set forth on Exhibit F – Family Dollar Signage Guidelines,

Exhibit F-1 – Signage Order Form and Exhibit F-2 – Preliminary Code Check Form.  As

part of Tenant's sign program, Landlord will, at Landlord's sole expense, obtain all

governmental permits required in order to erect Tenant's signs.  Landlord warrants that

Landlord has completed and submitted Exhibit F-2 - Preliminary Code Check Form to the

Decatur#500160

applicable local governmental authority.  Based on the local governmental authority's

responses to Exhibit F-2, Landlord plans to obtain sign permits for and erect two building

signs [Item A and Item C] and road signs, the undercanopy signs as shown on Exhibit A –

Site Plan and per the artwork approved by Tenant.  If the local governmental authority

does not issue Landlord the sign permits for these signs, then Landlord will erect the

largest building signs and road signs shown on Exhibit F-1 that are allowed by local

ordinances, including any variances obtained by Landlord or Tenant.  Landlord warrants

that the Demised Premises are not subject to any plans or restrictions imposed by or filed

with the local governmental authority that would prevent Landlord from erecting Tenant's

standard signs as shown on Exhibit F.  During the term of this Lease, Tenant may replace

its building signs and road signs with signs that are no larger than the signs erected by

Landlord.  Tenant may also erect professionally lettered signs and decals on the exterior

of the Demised Premises, such as signs designating Tenant's hours of operation or signs

marking its rear delivery door.  Landlord will ensure that Landlord has the necessary

approvals and easements in place to erect the road sign labeled on Exhibit A – Site Plan

as #2 Proposed Road Sign. Any replacement or additional signs permitted to be erected

or installed by Tenant shall comply with then applicable laws at Tenant's sole expense.

Upon Landlord's request, Tenant will provide to Landlord an electronic version of

Tenant's standard sign graphics and specifications to facilitate Landlord's compliance with

Exhibit F – Family Dollar Signage Guidelines and the artwork approved by Tenant.

Neither Landlord nor any other tenant will have the right to install any signs on the

Demised Premises.  Under no circumstances will Landlord remove Tenant's signs without



Decatur#500160

first obtaining Tenant's written consent.  Landlord will not permit the erection of other signs that would interfere with the visibility of Tenant's signs.

16. <u>EMINENT DOMAIN</u>.  The Property, as described on Exhibit H, is owned by Landlord in fee simple and is not subject to eminent domain proceedings or threat thereof. This Paragraph 16's reference to parking, service, access areas and the like is referring to the property as shown on Exhibit A – Site Plan.  If (a) all or any part of the building portion of the Demised Premises or any part of the service or access areas on the Demised Premises used by Tenant in the normal operation of Tenant's business or more than ten percent of the parking spaces in the Demised Premises; or (b) any part of the Shopping Center or Post Office Road that prevents ingress, egress or access to the receiving door of the Demised Premises by 18-wheel tractor trailers from Snapfinger Road, or (c) the area for Tenant's 18-wheel tractor trailers truck parking for deliveries, are taken by public authorities through the power of eminent domain, then Tenant will have the right to terminate this Lease.  Notwithstanding the above, if more than ten percent of the parking spaces are taken from the Demised Premises but Landlord is able to replace those parking spaces by giving Tenant access to other parking spaces, that are acceptable to Tenant, in Tenant's sole discretion, then Tenant will not terminate this Lease.  If this Lease is terminated, then any unearned rent will be refunded to Tenant.  If only a part of the Demised Premises or Post Office Road or parking, service or access areas of the Shopping Center are taken, and if Tenant elects not to terminate this Lease, then the rent will be reduced in the same proportion that the Demised Premises are reduced.  Landlord will restore the Demised Premises to as close to their condition as existed prior to the taking as is feasible.  Tenant will have the right to participate in any proceeding pertaining

Decatur#500160

to the taking of the Demised Premises.  Whether or not Tenant elects to terminate this

Lease, Landlord and Tenant will each be entitled to their separate claims based on their

respective interests even if a single award for all damages is given by the public authority.

17.  <u>TENANT'S DEFAULT</u>.  The following will constitute events of default:

(a) Tenant fails to pay any installment of fixed rent when due and the failure

continues for ▆▆▆▆s after Tenant receives written notice of default from Landlord, or

Tenant fails to pay any other sums due Landlord under this Lease when due and the

failure continues for ▆▆▆▆after Tenant receives written notice of default from Landlord;

or

(b) Tenant fails to perform or observe any other material agreement or condition on

its part to be performed or observed, and Tenant fails to commence to cure the default

within ▆▆▆▆ after receipt of notice of the default from Landlord or having commenced to

cure the default, Tenant fails to diligently pursue the curing of the default thereafter.

(c) Tenant is adjudicated bankrupt; or Tenant files in any court a petition in

bankruptcy, or for any reorganization pursuant to the provisions of any state or federal

insolvency or bankruptcy act; or any involuntary petition in bankruptcy is filed against

Tenant, and such petition is not vacated or withdrawn within one year after the date of

filing thereof; or Tenant makes a general assignment for the benefit of creditors; or a

receiver or trustee of all or a portion of Tenant's property is appointed, and such

appointment is not vacated within ▆▆▆▆ after it is made; provided that also as a result

of any such event described in this clause (c), Tenant ceases to pay rent and fails to cure

such default in its payment of rent prior to the expiration of the cure period described in

clause (a) above.

Decatur#500160

In any such case Landlord may immediately or any time before the default is corrected on ten days' written notice to Tenant terminate this Lease, and Tenant will forthwith quit and surrender the Demised Premises, but Tenant will remain liable as hereinafter provided.  Landlord may, with or without terminating this Lease, immediately or at any time before the default is corrected, reenter and resume possession of the Demised Premises and remove all persons and property therefrom by a suitable action or proceeding at law or in equity without being liable for trespass.  No re-entry by the Landlord will be deemed an acceptance of a surrender of this Lease.

Following any such re-entry, Landlord will use reasonable efforts to relet the Demised Premises for a commercially reasonable rent taking into consideration the condition of the Demised Premises and general market conditions.  Such reletting may be for a period equal to or greater or less than the remainder of the term of this Lease and upon such terms and concessions as the Landlord will deem reasonable to any tenant or tenants and for any use and purpose which Landlord may deem appropriate.  If this Lease will be terminated as provided in this Paragraph, after crediting any rents and other charges due upon reletting, then Landlord will be entitled to recover from Tenant and Tenant will pay to Landlord the following:  (1) an amount equal to all reasonable expenses incurred by Landlord in recovering possession of the Demised Premises; (2) all reasonable costs and charges for the care of the Demised Premises while vacant; (3) an amount equal to all reasonable expenses incurred by Landlord in connection with reletting the Demised Premises or any part thereof, including brokers commissions, advertising expenses and the cost of making any repairs Tenant was obligated to make (but specifically excluding any costs for renovating or remodeling the Demised Premises for a

27

Decatur#500160

new tenant and any attorney's fees to negotiate a new lease); and (4) the rent and other charges required to be paid by Tenant under this Lease which amounts will be due and payable by Tenant to Landlord on the several days on which such rent and other charges would have become due and payable had this Lease not been terminated.

Separate actions may be instituted by Landlord against Tenant from time to time to recover any damages which, at the trial of any such action, will then or theretofore have become due and payable to Landlord under any provisions hereof without waiting until the end of the term of this Lease, and neither the institution of suit or suits, proceeding or proceedings or the entering of judgment will bar Landlord from bringing a subsequent suit or proceeding for damages of any kind thereafter suffered.  It is expressly agreed that forbearance on the part of Landlord in the institution of any suit or entry of judgment for any part of the rent herein reserved to Landlord will in no way serve as a defense against nor prejudice subsequent action for later rent.  Mention in this Lease of any particular remedy will not preclude Landlord from any other remedy at law or in equity and Landlord will have all remedies and rights available to it at law or equity in addition to all remedies set forth herein except Landlord will not have the right to lock Tenant out of the Demised Premises without a court order and Landlord will not have the right to accelerate any monetary obligations of Tenant.

18.  SURRENDER OF POSSESSION.  Upon the termination of this Lease, Tenant will surrender the Demised Premises broom clean and in good repair, ordinary wear and tear, damage by fire or other casualty and Landlord's maintenance and repair obligations excepted.



Decatur#500160

     19. <u>EXCLUSIVE USE</u>.  So long as Tenant has not permanently closed its business at the Demised Premises, Landlord agrees that neither Landlord nor any entity controlled by Landlord nor any partner or principal of Landlord will lease (or permit the leasing or subleasing of) or sell any space on any property contiguous with or connected to the Demised Premises that is owned or controlled by Landlord or any entity controlled by Landlord or any partner or principal of Landlord to any variety store, variety discount store, discount department store, dollar store, liquidation or close-out store, thrift store, any store selling used clothing, or any store similar to Tenant in operation or merchandising.  This Paragraph is not intended to prohibit Landlord from leasing or selling space to a drugstore, toy store, hobby store, sporting goods store, card and gift store, hardware store, home improvement store, auto supply store, electronics store, office supply store or any other store selling a single category of merchandise even though the category may be a broad one such as toys or hardware.

     If Landlord breaches this Paragraph, then Tenant shall notify Landlord of such breach and if Landlord does not within ● days after receipt of Tenant's notice either (i) cause the tenant or other person whose operation violates this Paragraph to discontinue its operation, or (ii) initiate appropriate legal proceedings against such tenant or other person and diligently pursue those proceedings such that the business in breach of this Paragraph is discontinued within one year after the initiation of such proceedings, then Tenant's rights and remedies will include, but not be limited to, the right at any time after the one year period and during the continuation of such prohibited use to terminate this Lease.  So long as the breach exists and Tenant has not terminated this Lease, Tenant's only obligation with respect to fixed and percentage rent will be the payment of the lesser

Decatur#500160

of (i) the fixed rent set forth in Paragraph 1 or 6, as applicable, with Tenant still paying taxes and insurance as set forth in the Lease or (ii) percentage rent of two percent of Tenant's gross sales (as defined below), with no fixed rent. Percentage rent will be due within ███████ after the end of each lease year. Tenant will also have the right to seek legal and equitable remedies. The term "lease year" is a 52 week period ending on ██████████ "Gross sales" means all sales made by Tenant from the Demised Premises excluding sales tax, excise tax, refunds, void sales, and sales and revenues from vending machines and other mechanical devices including ATMs.

If Tenant is paying percentage rent pursuant to this Paragraph, Landlord will have the right to review Tenant's records relating to gross sales at the Demised Premises once for any lease year. The review will be conducted at Tenant's corporate offices in Matthews, North Carolina, during regular working hours on reasonable written notice, and within one year after Tenant sends its statement of percentage rent for the lease year that Landlord desires to review. The review will be limited to Tenant's electronically generated profit and loss statements and electronically generated daily sales reports for the business operated on the Demised Premises during the period covered by the review. If percentage rent was underpaid, then Tenant will promptly pay all amounts due. If percentage rent was overpaid, then Landlord will promptly refund to Tenant any overpayment.

20. <u>MUTUAL WAIVER</u>. Landlord and Tenant hereby release all claims and waive all rights of recovery against each other and their directors, officers, agents, employees, successors, sublessees or assigns, for any loss or damage to each party's respective property caused by or resulting from fire or other casualty of whatsoever origin even if

Decatur#500160

caused by negligence, to the extent that the loss or damage is covered by insurance or is required by the terms of this Lease to be covered by insurance.  However, nothing contained in this Paragraph will affect Landlord's obligation to repair or rebuild the Demised Premises as otherwise stated in this Lease.  All policies insuring the property of Landlord or Tenant will contain a provision or endorsement by which the insurer waives all rights of subrogation against the other party to this Lease and their directors, officers, agents, employees, successors, sublessees and assigns.

21.  <u>SUBORDINATION TO MORTGAGES</u>.  Upon Landlord's request, Tenant will sign, acknowledge and deliver to Landlord Tenant's standard form Subordination, Non-Disturbance and Attornment Agreement ("SNDA").  The SNDA will provide that this Lease will be subordinated to the lien of the mortgage or deed of trust ("Mortgage") that Landlord is placing on the Demised Premises, but that Tenant's rights under this Lease will not be impaired or diminished, its tenancy will not be disturbed or affected by any default under the Mortgage and in the event of foreclosure, this Lease will continue in full force and effect, and Tenant's rights, including any rights to extend the lease term will survive. During the term of this Lease, Tenant will provide one SNDA free of charge.  Any subsequent SNDA provided by Tenant will be subject to a processing fee payable to Tenant.  Landlord's request for any subsequent SNDA will be accompanied by Landlord's check in the amount of $300.00.  Landlord agrees to provide to Tenant free of charge within 60 days after the date of this Lease an SNDA from every Mortgage holder.

22.  <u>HOLDING OVER</u>.  If Tenant remains in possession of the Demised Premises after the expiration of the term of this Lease, then all the provisions of this Lease that are applicable during the final year of the lease term will continue to apply, except that Tenant

Decatur#500160

will pay, as fixed rent, an amount equal to ███ f the monthly fixed rental payment due

for the last month of the lease term immediately preceding the hold over and Landlord

and Tenant will each have the right to terminate this Lease by giving written notice of

termination.  Tenant will still be obligated to pay Tenant's taxes and insurance as set forth

in this Lease.  The effective date of termination will be ████ after the termination notice

is received by Landlord or Tenant, as applicable.  Tenant will be in default if Tenant fails

to vacate and surrender the Demised Premises to Landlord by the end of the ██████

after receiving Landlord's notice of termination.  If Landlord desires that Tenant vacate the

Demised Premises without holding over, Landlord may notify Tenant during the last year

of the lease term (at least ████████ to the last day of the lease term) that no holding

over will be permitted, and if after receiving that notice, Tenant fails to vacate the

Demised Premises on or before the last day of the lease term, then Tenant will be in

default.  If Tenant is holding over and Tenant fails to vacate the Demised Premises within

████ ys after Tenant's receipt of written notice to vacate from Landlord, then Tenant will

pay, as liquidated damages, an amount equal to ████ of the monthly fixed rental

payment due for the last month of the lease term immediately preceding the holding over,

for as long as Tenant remains in possession of the Demised Premises.

     23.  NOTICES.  (a) All notices from Tenant to Landlord or Landlord to Tenant must

be in writing to be effective.  Notices sent via fax and e-mail will be effective between

Landlord and Tenant, except that notices sent by Tenant pursuant to Paragraph 6, notices

of default sent by either party including any notice intending to start a cure period under

Paragraph 14 or 17 or any notice sent to change the notice address of Landlord or Tenant

must be sent to the address set forth below either by (i) United States mail sent via

Decatur#500160

Certified Mail, Return Receipt Requested, or by (ii) commercial national delivery service capable of providing written proof of delivery.  Any notice sent by certified mail or commercial delivery service will be deemed given when sent to the address of a party as provided for by this Lease, even if the party to whom the notice is sent refuses to accept delivery.

<u>As to Landlord</u>:          ALEXANDRIA VENTURES II, LLC
                           1325 Satellite Blvd., Suite 1001
                           Suwanee, GA 30024

<u>As to Tenant</u>:
<u>For U.S. Mail</u>:          Lease Administration Department
                           FAMILY DOLLAR STORES OF GEORGIA, INC.
                           Post Office Box 1017
                           Charlotte, North Carolina 28201-1017

    -or-

<u>For Commercial</u>          Lease Administration Department
<u>Delivery</u>:              FAMILY DOLLAR STORES OF GEORGIA, INC.
                           10301 Monroe Road
                           Matthews, North Carolina 28105

Either Landlord or Tenant may change its notice address by giving written notice to the other party of the new address as provided in this Paragraph.

(b) All rent and other payments will be made by Tenant's check payable to Landlord and mailed to Landlord at the address designated above unless Tenant elects to make payments to Landlord by direct deposit into Landlord's bank account.  Tenant will not be obligated to pay rent to any person or entity other than Landlord until Tenant receives either: (i) a written statement signed by Landlord and reasonably acceptable to Tenant designating the person or entity to receive rent and, if applicable, providing notice of the transfer of Landlord's interest in the Demised Premises, or (ii) a copy of the deed



Decatur#500160

signed by Landlord transferring ownership of the Demised Premises or a copy of an assignment of this Lease signed by Landlord.  In order to be eligible for payment by direct deposit, Landlord must fill out, sign and return to Tenant Tenant's standard Automated Clearing House ("ACH") Direct Deposit Authorization Form ("Direct Deposit Authorization"), a copy of which is attached as Exhibit G -- Direct Deposit Authorization.  If Tenant elects to make payments via ACH Direct Deposit, then Tenant will deposit rent and other payments directly into the bank account specified by Landlord in the Direct Deposit Authorization ("Landlord's Account").  Landlord will bear all risks arising out of Landlord's failure to provide correct information pertaining to Landlord's Account. Landlord agrees to provide written notice to Tenant canceling the Direct Deposit Authorization at least 30 days prior to any assignment of rents payable under this Lease to a party other than Landlord, or any assignment of Landlord's interest in the Demised Premises.  In the event Tenant deposits funds into Landlord's Account that Landlord is not entitled to whether due to Tenant's error or any other cause, Landlord authorizes Tenant to make an adjusting debit entry to Landlord's Account up to the amount of the erroneously deposited funds, and if the account has been closed or lacks the funds to fully refund the erroneous deposit, then Landlord will repay to Tenant all sums paid to Landlord's Account in error.  Tenant may cancel or discontinue making payments by ACH Direct Deposit at any time after notice to Landlord in which event Tenant will make rent and other payments by mail pursuant to subparagraph (a) of this Paragraph.  If Landlord desires to change Landlord's Account, then Landlord will provide Tenant with a new completed original Direct Deposit Authorization Form.  Landlord acknowledges that changing the Landlord's Account may cause a delay in payment.  A payment will not be

Decatur#500160

deemed to be late if it is delayed due to a change in Landlord's account .

24. <u>RECORDING</u>. Landlord agrees to execute a memorandum of lease or short form lease (collectively "Short Form Lease") reasonably acceptable to Landlord and Tenant which Tenant may record, at its expense, in the appropriate office for the recordation of real estate conveyances for the county or other jurisdiction in which the Demised Premises are located. Landlord will furnish an accurate legal description of the Property to record the Short Form Lease and Landlord will execute and deliver to Tenant any other affidavits, statements or documents needed to record the Short Form Lease.

25. <u>QUIET ENJOYMENT</u>. Landlord covenants and warrants that Tenant will have and enjoy during the term of this Lease the quiet and undisturbed possession of the Demised Premises together with all applicable appurtenances. Rents and other charges due under this Lease will abate during any period of time Tenant is deprived of the use of the Demised Premises.

26. <u>COMPLIANCE WITH LAWS</u>. Landlord will, at Landlord's sole expense, comply with all requirements of all county, municipal, state and federal laws and regulations, now in force, or which may hereafter be in force, which pertain to (i) any environmental condition of the Demised Premises, including without limitation asbestos, radon and hazardous substances, which is in existence on the date of this Lease or which comes into existence after the date of this Lease due to the acts of persons other than Tenant, its agents or employees, and (ii) any other physical condition of the Demised Premises which pertains to those portions of the Demised Premises that Landlord is obligated to maintain and repair pursuant to Paragraph 12. Landlord shall be responsible for the maintenance, modification and monitoring of the sprinkler systems and if a

Decatur#500160

sprinkler system does not exist in the Demised Premises but is required by law to be installed then Landlord will install the system.

Tenant will, at Tenant's sole expense, comply with all of the requirements of all county, municipal, state and federal laws and regulations now in force, or which may hereafter be in force, which pertain to the operation of Tenant's business in the Demised Premises (including, without limitation, Tenant's handling, storage, transportation, use and disposal of toxic or hazardous or flammable materials) or which pertain to any physical condition (other than the presence of asbestos or other hazardous material) of those areas of the Demised Premises which Tenant is obligated to maintain and repair pursuant to Paragraph 12.

27.  PARAGRAPH HEADINGS; ETC.  The numbered sections of this Lease are referred to as Paragraphs, and the phrase "this Paragraph" means the entire numbered Paragraph and not just a grammatical paragraph contained within a numbered Paragraph. The Paragraph headings throughout this Lease are for convenience and reference only, and will in no way be held to explain, modify, amplify, or aid in the interpretation, construction or meaning of the provisions of this Lease.  If any provision of this Lease is held to be invalid or unenforceable, then the remainder of this Lease will not be affected, and all other provisions will be valid and enforceable to the fullest extent permitted by law. If any words are stricken from this Lease, whether the words are preprinted, typewritten or handwritten, then no inferences will be drawn as to the parties' intent in striking the deleted words, and this Lease and the parties' intent will be interpreted as if the stricken words had never appeared.  This Lease is a negotiated agreement in which Landlord and Tenant have had equal power in determining its terms, and Landlord and Tenant agree

Decatur#500160

that any rule of construction that a document is to be construed against the party who prepared it will not be applied.  The term "lease year" is a 52 week period ending on ██████ ████Any paper, writing or drawing that is designated as an exhibit to this Lease, whether or not physically attached, is a part of this Lease.

28.  <u>CONFIDENTIALITY OF LEASE TERMS AND SALES INFORMATION</u>. Landlord agrees that all terms of this Lease as well as any information provided to Landlord pertaining to Tenant's gross sales are confidential and will not be divulged by Landlord without the written consent of Tenant to anyone other than Landlord's mortgagees or prospective mortgagees and to bona fide prospective purchasers of the Demised Premises.

29.  <u>NON-WAIVER</u>.  No waiver of any agreement, condition or covenant will be valid unless it is set forth in writing signed by the party to be bound by the waiver.  No waiver of a breach of any agreement, condition or covenant will be claimed or pleaded to excuse a subsequent breach of the same agreement, condition or covenant or any other agreement, condition or covenant.

30.  <u>ATTORNEYS' FEES</u>.  In the event of litigation between Landlord and Tenant, the prevailing party will be entitled to recover from the losing party reasonable attorneys' fees and reasonable out-of-pocket litigation expenses and court costs all as awarded by the Court.  A party who is awarded a money judgment will be considered to be the losing party if the amount awarded is less than the last written offer of payment or settlement made by the other party prior to or within ██████ after suit is filed.  In addition, the Court may decide that there is no true prevailing party and that neither party is entitled to its attorneys' fees or litigation expenses.

37

Decatur#500160

31.  JURISDICTION.  This Lease will be construed and enforceable in accordance with the laws of the State where the Demised Premises are located.  Any lawsuit brought by Landlord or Tenant against the other must be filed in a court of general jurisdiction where the rules of civil procedure for the State where the Demised Premises are located will apply.

32.  ESTOPPEL LETTERS.  Landlord and Tenant agree, from time to time at reasonable intervals, within ▮▮▮▮▮ after written request by the other party, to execute and deliver to the other party a statement certifying to any existing or prospective mortgagee, purchaser or assignee, that this Lease is in full force and effect, that this Lease has not been assigned, modified, supplemented or amended, that Tenant is in possession of the Demised Premises, and that to the best knowledge of the certifying party, the other party is not in default, or properly stating the facts if any of such certifications would not be factual, and stating the date through which fixed rent has been paid, the expiration date of the then current term and the number of remaining extensions of the term available to Tenant under this Lease.  Landlord's request for an estoppel letter should be sent to Tenant via e-mail to:  estoppel@familydollar.com.  In addition, upon receipt of written request from Landlord, the Guarantor will also send an estoppel in accordance with this Paragraph.

33.  TAXPAYER IDENTIFICATION INFORMATION.  The Internal Revenue Service ("IRS") requires Tenant to provide a name and Taxpayer Identification Number ("TIN") for each person or entity to whom Tenant makes payments.  In order for Tenant to comply with this requirement, Landlord agrees that within 30 days after the date of this Lease, Landlord will provide to Tenant a completed W-9 Form with Landlord's TIN and the

Decatur#500160

name that corresponds with the number.  Further, if Landlord's TIN and corresponding name change at any time during the term of this Lease, then Landlord will provide an updated W-9 form to Tenant.

The IRS assesses a penalty to Tenant if Tenant fails to provide the required information or provides a TIN that does not match the name in the IRS' records.  If Landlord fails to provide the required information to Tenant, or provides inaccurate information to Tenant, and as a result the IRS assesses Tenant with a penalty, then Tenant will have the right to deduct the amount of the penalty up to ▇▇▇▇ from the fixed rent due to Landlord.  Tenant will show the deduction on the remittance advice provided with Tenant's rent check.

34.  FORCE MAJEURE.  If either Landlord or Tenant is delayed or hindered in or prevented from performing any act it is required to perform under the terms of this Lease by reason of strikes, lock-outs, failure of power, restrictive governmental laws or regulations, riots, insurrection, war, or other reason beyond the control of the party delayed, then the performance of the act will be excused for the period of the delay, and any time limit imposed by this Lease for the performance of the act will be extended for a period equivalent to the delay.  Notwithstanding the foregoing, (a) if the other party desires to perform the act required of the delayed party and is able to do so, then that party will have the right to perform the act and recover the reasonable costs from the delayed party; (b) in no event will the time period for Landlord's delivery of the Demised Premises to Tenant pursuant to Paragraphs 4, 5 or 10 be extended pursuant to this Paragraph by more than ▇▇▇▇ and (c) this Paragraph will not apply to extend the Delivery Date after Landlord gives the Delivery Notice to Tenant.

Decatur#500160

35.  ASSIGNMENT/SUBLETTING.  Tenant will have the right to assign this Lease or sublet the Demised Premises only with the Landlord's prior written consent, which consent will not be unreasonably withheld or delayed.  Within ███ after Tenant notifies Landlord of the prospective assignee's or subtenant's name and proposed use of the Demised Premises, Landlord will either approve or reject such assignee or subtenant by written notice to Tenant.  If Landlord does not respond to Tenant's notice within the ● day period, then Landlord will be deemed to have consented to the prospective assignee or subtenant.  When determining whether to grant its consent, Landlord will consider only matters relating to the proposed use of the Demised Premises such as parking needs of the proposed assignee or subtenant.  If Landlord unreasonably withholds its consent in connection with any requested assignment or subletting, then Landlord will have committed a material breach of this Lease and Tenant will be entitled to terminate this Lease and be released of its obligations hereunder.  Notwithstanding the foregoing, Tenant will not need Landlord's consent if Tenant assigns this Lease or sublets the Demised Premises to any corporation or other entity into or with which Tenant may be merged or consolidated or to any corporation or other entity which will be an affiliate, subsidiary, parent or successor of either Tenant or a corporation or other entity into or with which Tenant may be merged or consolidated, or to any person or entity acquiring ten or more of Tenant's stores.

36.  ENTIRE AGREEMENT; BINDING ON SUCCESSORS.  This Lease constitutes the entire agreement between Landlord and Tenant and all understandings and agreements between Landlord and Tenant are merged into this Lease.  This Lease may not be modified, amended or supplemented except by an agreement in writing signed by

Decatur#500160

Landlord and Tenant. All covenants and agreements of this Lease will extend to and be binding upon the heirs, devisees, executors, administrators, successors in interest and assigns of both Landlord and Tenant.

37. <u>LIMITATION OF LANDLORD LIABILITY</u>. Notwithstanding anything contained in this Lease to the contrary, except for Landlord's construction or improvement obligations, if any, as stated in Paragraph 4, and except for loss or damage caused by conditions within the Landlord's scope of maintenance responsibility needing repair, of which Landlord has been given prior written notice by Tenant and a reasonable time to make repairs, Landlord will have no personal liability with respect to any monetary obligations or liabilities arising under this Lease, and Tenant will look solely to (i) its right to offset against rent and other sums due Landlord and (ii) Landlord's interest in the Demised Premises and the rents and income therefrom (and any insurance proceeds or condemnation awards) for the satisfaction of any losses and damages sustained by Tenant in the event of a default by Landlord of any of Landlord's obligations under this Lease; provided, however, the provisions of this Paragraph will be applicable only if all mortgagees holding mortgages or deeds of trust prior in lien to this Lease have executed non-disturbance agreements satisfactory to Tenant. Nothing in this Paragraph will be construed as a limitation on Tenant's right to pursue injunctive or other non-monetary relief against Landlord.



41

Decatur#500160

Landlord and Tenant have caused this Lease to be duly signed and sealed.

Witness:

Print Name: _T.K. Underwood_

Print Name: _Robert W. Scholz_
Notary Public, Fulton County, GA
As to Alexandria Ventures II, LLC
My Commission Expires:

LANDLORD
ALEXANDRIA VENTURES II, LLC          (SEAL)

By: _____
Name: Charles Asensio
Title:   Managing Member

Witness:

Print Name: _GEORGINA M. AGUILERA_

Darnell A. Stallings
Notary Public, Mecklenburg County, NC
As to Family Dollar Stores of
Georgia, Inc.
My Commission Expires:
08/08/2014

TENANT
FAMILY DOLLAR STORES OF GEORGIA, INC.

By: _____
Thomas M. Nash
Senior Vice President
Real Estate Development

ATTEST:

_____
Thomas E. Schoenheit
Assistant Secretary





Exhibit A – Site Plan
Decatur, GA #500160
Page 1 of 2





Exhibit A-1 — Site Plan
Decatur, GA #500160
Page 2 of 2

INITIAL HERE

## "Exhibit B - Family Dollar Prototype Plan Sheet Index"

***Proposed Family Dollar Store 9180 or 8000 SF Prototype - Plan #:  2009-02***

| SHEET DESCRIPTION: | DATE: | SHEET NO.: |
|---|---|---|
| Cover Sheet/Project Data | 04-01-09 | T-1 |
| Site Plan Submission Requirements / Site Investigation Report | 04-01-09 | D-1 |
| Signage Requirements | 04-01-09 | D-2 |
| Site Plan Criteria | 04-01-09 | C-1 |
| Typical Site Plans | 04-01-09 | C-2 |
| 102 X 90 Floor Plan, Tile Plan, Fixture Plan & Details | 04-01-09 | A-1A |
| 90 X 102 Floor Plan, Tile Plan, Fixture Plan & Details | 04-01-09 | A-1B |
| 100 X 80 Floor Plan, Tile Plan, Fixture Plan & Details | 04-01-09 | A-1C |
| 80 X 100 Floor Plan, Tile Plan, Fixture Plan & Details | 04-01-09 | A-1D |
| Elevations & Exterior Finish Schedule | 04-01-09 | A-2 |
| Building Sections & Finish Schedule | 04-01-09 | A-3 |
| Notes and Details | 04-01-09 | A-4 |
| MEP Schedules, Notes and Details | 04-01-09 | M-1 |
| 102 X 90 MEP Plans | 04-01-09 | M-2A |
| 90 X 102 MEP Plans | 04-01-09 | M-2B |
| 100 X 80 MEP Plans | 04-01-09 | M-2C |
| 80 X 100 MEP Plans | 04-01-09 | M-2D |

### The security classification for this site requires a security monitor.

### Exhibit B - Family Dollar Prototype Plan Sheet Index
### Decatur, GA #500160



Project #500160
Address: Snapfinger Road &Wesley Chapel Road
Decatur, GA

## EXHIBIT C – ADA CERTIFICATION

The undersigned certifies that the construction by Landlord of the Demised Premises complies with the Standards for Accessible design for new construction included in Appendix A to the Title III implementing regulations for the Americans with Disabilities Act of 1990, as amended, and that the common areas meet those standards.

Dated this _____ day of _____, 20____.

Witnesses (or ATTEST)

_____

_____          By:_____

When construction is completed, this certification is to be dated, signed, witnessed and mailed to Lease Administration Department, Family Dollar Stores, Inc., P. O. Box 1017, Charlotte, NC  28201-1017.

EXHIBIT C – ADA CERTIFICATION
DECATUR, GA. #500160





## "Exhibit D-1: Development Status Report"

**Landlord's representative will email or fax this completed form every week
(by noon on Thursday) to Family Dollar Build-To-Suit Development Project Manager.
(Email: fdsbts@familydollar.com or Fax: 704-814-4282)
City, ST and Project Number to be on every correspondence sent by Landlord's representative to FDS.**

Landlord/Developer Name: _____
Company Name: _____
Phone: _____  Cell: _____
Email: _____  Fax: _____

Alternate Contact name for Landlord/Developer: _____

Project Location (City, ST): _____  Family Dollar Project #: _____

**Provide Company Name, Contact Name and Phone # for each:**
  Environmental Consultant: _____
  Civil Engineer: _____
  Architect: _____
  General Contractor: _____

☐  **Project Update for Week of:** _____ / _____ / _____
☐  **Check box if no changes were made this week, since last week's report.**

| **Development Stage** | Date Ordered /Submitted | Date Expected | Date Received |
|---|---|---|---|
| 1.  Survey: (Boundary, ALTA, Topo) | _____ | _____ | _____ |
| 2.  Geotechnical Soils Report | _____ | _____ | _____ |
| 3.  Phase I Environmental | _____ | _____ | _____ |
| 4.  Phase II (other DEP requirement) | _____ | _____ | _____ |
| 5.  Rezoning (if required) | _____ | _____ | _____ |
| 6.  Variances or Easements (if required) | _____ | _____ | _____ |
| 7.  Site Plan Approved By FDS | _____ | _____ | _____ |
| 8.  Engineered Civil Plans -sealed | _____ | _____ | _____ |
| 9.  Architectural Plans (incl: Strct, MPE) -sealed | _____ | _____ | _____ |
| 10. Metal Building Plan (if applicable) -sealed | _____ | _____ | _____ |
| 11. DOT Permit | _____ | _____ | _____ |
| 12. Site Permit | _____ | _____ | _____ |
| 13. Building Permit | _____ | _____ | _____ |

**Estimated Construction Start Date:** _____
**Estimated Date for Slab Pour:** _____
**Estimated Number of Weeks for Construction:** _____
**Estimated Construction Completion Date/Delivery Date:** _____

**Landlord/Developer Comments:** _____
_____
_____
_____

*Note: All DOT, Site/Civil and Architectural Plans must be approved by Family Dollars Stores prior to applying for Permits.*

**Exhibit D-1  - Development Status Report**
**Lease Agreement Dated:** 7-9-10
**Project #500160 - Decatur, GA**

 **FAMILY DOLLAR**

## "Exhibit D-2: Construction Milestone Status Report"

Landlord's representative will email or fax this completed form
at the completion of each milestone to Family Dollar Build-To-Suit Construction Project Manager.
(Email: fdsbts@familydollar.com or Fax: 704-814-4282)
City, ST and Project Number to be on every correspondence sent by Landlord's representative to FDS.
This form is to be used as a continuous report until project completion.
Use the previous report each time you send a new Milestone Status Update to explain the earlier history, as well as new status information you are sending

E-Mail Form to Family Dollar

### PROJECT INFORMATION

| | | | |
|---|---|---|---|
| STORE NUMBER | | PROJECT NUMBER | Construction Week |
| CONSTRUCTION PROJECT MANAGER | | STORE PHONE NUMBER | NR5 |
| DIRECTOR OF CONSTRUCTION | | | |
| CITY | STATE | TODAY'S DATE | Construction Period |
| ADDRESS | | Construction Start | Days Remaining |
| | | Construction Finish | |
| | | Store Open Date | |
| CONTRACTOR | | CONTRACTOR PHONE | |
| SUPERINTENDENT | | SUPERINTENDENT PHONE | |

### PROVIDE PHOTOGRAPHS AT EACH MILESTONE. INDICATE IF YOU ARE STILL ON SCHEDULE.

At each of the Milestones listed below, Family Dollar Stores requests to receive the updated "Exhibit D-2  Construction Milestone Status Report" as well
as photos as detailed in the "Exhibit D-3  Photo Instructions".  Email or fax this information to (Email:fdsbts@familydollar.com or Fax: 704-814-4282)

| MILESTONE 1: SLAB ON GRADE | [Description: Formed and poured concrete building slab.] |
|---|---|

☐ Provide Photographs 1 - 8 as indicated on Exhibit D-3  Photo Instructions

☐ Are you still on schedule for Completion Finish as indicated above      ☐ Yes      ☐ No
   If not still on schedule        Why

   Revised Completion Date

☐ LL's Construction Scheduled provided and sent  How was it sent?     ☐ Email     ☐ Fax     ☐ Overnight Mail

| MILESTONE 2: BUILDING ERECTION | [Description: Red iron including roof and wall sheeting.] |
|---|---|

☐ Provide Photographs 1 - 8 as indicated on Exhibit D-3  Photo Instructions

☐ Are you still on schedule for Completion Finish as indicated above      ☐ Yes      ☐ No
   If not still on schedule        Why

   Revised Completion Date

☐ Provide what date site/building will be ready for signage        Freestanding Road Sign
                                                                   Building Sign

| MILESTONE 3: INTERIOR FRAMING (Utility Rough-In) | [Description: Complete wall furring and metal studs  ready for drywall.] |
|---|---|

☐ Provide Photographs 1 - 19 as indicated on Exhibit D-3  Photo Instructions

☐ Are you still on schedule for Completion Finish as indicated above      ☐ Yes      ☐ No
   If not still on schedule        Why

   Revised Completion Date

☐ Has Freestanding Road Sign been installed?      ☐ Yes      ☐ No  and if not why

☐ Has Building Sign been installed?      ☐ Yes      ☐ No  and if not why

☐ Building As-Built attached  How was As-Built sent?     ☐ Email     ☐ Fax     ☐ Overnight Mail

| MILESTONE 4: INTERIOR FINISHES (Delivery Notice) | [Description: Ceiling grid hung and all drywall installed.] |
|---|---|

☐ Provide Photographs 1 - 24 as indicated on Exhibit D-3  Photo Instructions

☐ Provide Photographs verifying both Road and Building Signs are installed

☐ Are you still on schedule for Completion Finish as indicated above      ☐ Yes      ☐ No
   If not still on schedule        Why

   Revised Completion Date

☐ Electrical As-Built attached  How was As-Built sent?     ☐ Email     ☐ Fax     ☐ Overnight Mail

☐ Utility Plans filled out and sent  How was it sent?     ☐ Email     ☐ Fax     ☐ Overnight Mail

☐ Delivery Notice and ADA Certification attached      ☐ Yes      ☐ No
   If not attached        Why

| MILESTONE 5: CONSTRUCTION FINISH OUT (Including Completed Punch List Items) | [Description: All site, parking and building complete.] |
|---|---|

☐ Provide Photographs 1 - 24 as indicated on Exhibit D-3  Photo Instructions

☐ Are you still on schedule for Completion Finish as indicated above      ☐ Yes      ☐ No
   If not still on schedule        Why

   Revised Completion Date

☐ Construction 100% Complete      ☐ Yes      ☐ No  and if not why

☐ Final Certificate of Occupancy attached      ☐ Yes      ☐ No  and if not why

☐ Completed Punch List Items and Photos attached      ☐ Yes      ☐ No  and if not why

LL must provide the LL's Construction Schedule to the Family Dollar Build-To-Suit Construction Project Manager on or before Milestone 1 updates.
Family Dollar Build-To-Suit Construction Project Manager will forward sample.

If the Construction Completion Date/Delivery Date changes at any time during the construction phase, LL and/or GC must update the Family
Dollar Build-To-Suit Construction Project Manager immediately of the change.

Family Dollar Stores will not accept delivery of the space without the following. Access to the site with site with outside surface utilities are installed and
calculated  but not limited to the following (electric, gas (if applicable) water and sewer. LL further must also verify that construction including parking areas,
driveways, landscape areas, storm sewer and water retention areas  are 100 % complete at the time of delivery.



**Exhibit D-2  - Construction Milestone Status Report**
**Lease Agreement Dated: _____ 7-9-10**
**Project  #500160 - Decatur, GA**

# FAMILY DOLLAR

Mail To P.O. Box 10.7, Charlotte, NC 28201-1017
Ship To 10301 Monroe Road, Matthews, NC 28105

"Exhibit D-3  Photo Instructions"



Examples of Vantage Points for Exterior Photographs
(Use these vantage points every time several are shown)

1-3   Corner shots - take as much of the entire front, side, surrounding
      area and building  The shot of the building being the most
      important
5     These shots should include the exposed rear parking lot as well
      as the building  Photo location should be from a vantage
      area such that will show full view of building and parking lot
6     If there is a person on the side of the building such as an angle
      like this will show the building and parking
7-8   Shot of the sides and rear of the building
2-23  Take shot that will show area along the full property line
24    Shot showing the utility meter location and any special features
      for them

The large scale of photos is to ensure that we need to see all sides of
the buildings and show area that allows visibility. We also need to see
parking areas - grass is represent for each signage, if visible. landscaping
if installed, tenant if installed



**Examples of Vantage Points for Interior Photographs**
(Use these vantage points once you get the building enclosed.)

9-13   Room shots and they need to show as much of each room as
       possible. The basic idea is to show as much of each fixture
       in each room as possible.
14     Break area shot designed to show the outlets used for the
       break area.
15     Receiving room shot.
16-19  Are shots inside the sales floor standing at each corner and
       viewing as much of the sales floor from the corner as indicated.

The basic rule of thumb is to remember that we are looking to see as
much detail of what we have indicated on plans and specifications.

**Exhibit D-3  - Photo Instructions**
**Page 2 of 3**





**Exhibit D-3  - Photo Instructions**
Page 3 of 3





## "Exhibit D-4:  Punch List Procedures"

From:  Build-To-Suit Construction Project Manager
Family Dollar Stores

To:   Build-To-Suit Landlord

RE:   Punch List Procedures

The following details the timeline and expectations for resolving "Punch List" items.

Timeline for Inspection:

1) You have completed interior finished and the project is nearing final stages.
2) Per the Lease, you have sent the Built-To-Suit Construction Project Manager a completed Milestone 4 Report with the attached Delivery Notice and ADA Certification.
3) In response the Build-To-Suit Construction Project Manager will send confirmation that we have received your photos, report, Delivery Notice and ADA Certification, and will send you a notice of Final Walk Through Inspection.  The notice will include:
   a. Contact information regarding your representative.
   b. Contact information for the Family Dollar Inspector.
   c. Tentative inspection date set for one week prior to delivery of the building to Family Dollar.
4) The Family Dollar Inspector will make contact with your representative to confirm a date for the meeting.  (Meeting date is typically one week prior to delivery.)
5) At the meeting, both parties will inspect the project and note any issues, incomplete items, and/or divergence from our prototypical store plans.
6) The inspector will provide your representative a complete "Punch List" before leaving the site with a timeframe for each item to be corrected.
7) The Family Dollar Construction Assistant will send you a letter of outstanding "Punch List" items with expected completion dates.
8) Please be aware that the Store Project Supervisor (Store Opener) will also look for discrepancies and report them to the home office and to the Built-To-Suit Construction Project Manager.  Any additional items from the Store Project Supervisor (Store Opener) will be added to the "Punch List" and a revised copy will be forwarded for completion.
9) In order to close the "Punch List", weekly updates of the completed items and photos indicating completion must be sent to the Family Dollar Construction Assistant until all issues are resolved.

**Exhibit D-4  - Punch List Procedures**
**Lease Agreement Dated:** ___7-9-10___
**Project #500160 - Decatur, GA**

**FAMILY** [logo]

### CONSTRUCTION PUNCH LIST FORM

| | | | | |
|---|---|---|---|---|
| Project Manager | | Landlord: | Today's Date: | |
| Director  Store Construction | | LL Phone Number: | Construction Start: | |
| Project Number: | | LL E-mail address: | Construction Finish: | |
| Store Number | | LL Superintendent's Name | Store Open Date | |
| Address: | | LL Superintendent's Phone #: | Construction Line (weeks): | |
| City | | FDS General Contractor | Days Remaining | |
| Store Phone Number | | FDS GC Phone Number | Date PUNCH LIST delivered to GC/LL | |
| Work By: | | FDS GC E-mail address | Date PUNCH List to Home Office: | |
| Construction Clerical Support: | | FDS Superintendent's Name | | |
| | | FDS Superintendent's Phone # | | |

---

**1.** SITE INFORMATION:

1.  SIGNS: Building Sign (Bldg) and Road Sign (Rd.) including photocells (list below)

| | | |
|---|---|---|
| BLDG. | Installed | 0 |
| BLDG. | Operational | 0 |
| RD. | Installed | 0 |
| RD. | Operational | 0 |

2.  Sewer connected:

3.  Gas Service connected:

4.  Retention pond complete:

5.  Landscape complete:

6.  Parking lot complete and striped:

7.  Retaining wall - sidewalk - HVAC pad complete:

8.  Exterior under canopy lights installed and operational:

9.  Exterior flood lights installed and operational:

10.  Parking lot lights installed and operational:

11.  Parking lot lights installed and operational:
     0

ADDITIONAL COMMENTS:

12  Water Service connected - meter installed:

13  Electrical Service connected:
    0
    Temporary meter installed
    Permanent meter installed
    Panel labeled   0

14.  Landscape irrigation installed - meter installed
     0

15  ADA parking requirements:
    ADA Ramp Cut out installed with 50' of front door 0
    2 ADA parking signs 60" w/l (one w/van access) 0
    1 ADA space  8'w space w/5' striped unload isle  0
    2 ADA van space  8'w space w/8' striped unload  0

16  Telephone Service connected to building:

17  If Risk Class = 3 or higher, is demarc installed inside building?
    0

18  Building dimensions match Store Planning Floor and Lighting plans:
    0

19.  Work completed in accordance with Scope of Work or approved CD's:
     0

20.  Utility survey submitted to Utility Department:
     0

---

**2.** OPENING REQUIREMENTS

1.  Are all Final Inspections completed?
    0

2.  Is a Certificate of Occupancy issued?
    0

3.  0

4.  Are there any issues that may affect the store from Fixturing, Merchandising and Opening?
    0

---

**3.** EXTERIOR BUILDING

Layout is for reference only - Your individual layout may be different (indicate Sign Types where installed)

ADDITIONAL COMMENTS (Exterior and Sign)

REAR WALL

LEFT WALL     A     RIGHT WALL

U/C     Road Sign

FRONT WALL

Sign information
Use the pull-down box to choose each building and road sign detailing the sign type. (If custom, list size in comments)

| SIGNS - Building Sign | Complete by date | | SIGNS - Road Sign | Complete by date |
|---|---|---|---|---|
| 1  0 | | 2  0 | | |

| FRONT WALL | Complete by date | | RIGHT WALL | Complete by date |
|---|---|---|---|---|
| 1. | | 1. | | |
| 2. | | 2 | | |
| 3. | | 3 | | |
| 4 | | 4 | | |
| 5 | | 5 | | |

| LEFT WALL | Complete by date | | REAR WALL | Complete by date |
|---|---|---|---|---|
| 1 | | 1 | | |
| 2 | | 2 | | |
| 3 | | 3 | | |
| 4 | | 4 | | |
| 5 | | 5 | | |

---

**4.** INTERIOR BUILDING

Layout is for reference only - Your individual layout may be different

ADDITIONAL COMMENTS

REAR WALL

LEFT RECEIVING WALL     RECEIVING     RIGHT WALL

SALES AREA

TR
TR  VESTIBULE

OFFICE     FRONT WALL

| FRONT WALL | Complete by date | | RIGHT WALL | Complete by date |
|---|---|---|---|---|
| 1 | | 1 | | |
| 2 | | 2 | | |
| 3 | | 3 | | |
| 4 | | 4 | | |
| 5 | | 5 | | |

| LEFT RECEIVING WALL | Complete by date | | REAR WALL | Complete by date |
|---|---|---|---|---|
| 1 | | 1 | | |
| 2 | | 2 | | |
| 3 | | 3 | | |
| 4 | | 4 | | |
| 5 | | 5 | | |

**Exhibit D-4  - Punch List Procedures**
**Page 2 of 3**

INITIAL HERE



1. **Sales Area Lighting and emergency lights:**
   Installed ___ 0
   Operational ___ 0

2. **Flooring and cove base:**
   Installed ___ 0
   Cleaned and Waxed ___ 0

3. Ceiling Grid and Tile Installed: ___ 0

4. Arm-a-door(s) and signage installed ___ 0

5. Are there any roof leaks in Sales Area? ___ 0

6. Electrical connections installed for cashwraps, sensormatic and Unicru? ___ 0

7. Electrical connections installed for drink machine/season outlet and CCTV? ___ 0

8. Electrical connections installed for food coolers? ___ 0

9. **Ventilation System operational (verified):**
   A/C ___ 0
   Heat ___ 0
   T-Stats ___ 0
   In Comment section above, explain how you verified the operations of the HVAC

**5. RECEIVING ROOM AREA**

Layout is for reference only - Your individual layout may be different

REAR RECEIVING WALL

LEFT WALL ___ RIGHT WALL

FRONT RECEIVING WALL

ADDITIONAL COMMENTS

| FRONT STOCK WALL | Compete by date | | RIGHT STOCK WALL | Compete by date |
|---|---|---|---|---|
| 1. | | | 1. | |
| 2. | | | 2. | |
| 3. | | | 3. | |
| 4. | | | 4. | |
| 5. | | | 5. | |

| LEFT STOCK WALL | Compete by date | | REAR STOCK WALL | Compete by date |
|---|---|---|---|---|
| 1. | | | 1. | |
| 2. | | | 2. | |
| 3. | | | 3. | |
| 4. | | | 4. | |
| 5. | | | 5. | |

1. **Receiving Room Lights and emergency lights:**
   Installed ___ 0
   Operational ___ 0

2. Quad Box installed for Break Area: ___

3. Arm-a-Door(s) and signage installed: ___

4. Metal Canopy installed at receiving door ___

5. Receiving door buzzer and peep site installed: ___

6. Phone Board installed with receptical. ___

7. Receiving Room floor sealed and cove base installed: ___

8. Receiving Room unit heater installed and operational: ___

9. Cat 5 and phone jacks installed and connected to punch block with dial tone: ___

10. Are there any roof leaks in the Receiving Area? ___

**6. INTERIOR OFFICE / RESTROOMS / VESTIBULE**

Toilet
Toilet   VESTIBULE
Office

ADDITIONAL COMMENTS:

| OFFICE | Compete by date | | WOMEN'S RESTROOM | Compete by date |
|---|---|---|---|---|
| 1. | | | 1. | |
| 2. | | | 2. | |
| 3. | | | 3. | |
| 4. | | | 4. | |
| 5. | | | 5. | |

| MEN'S RESTROOM | Compete by date | | VESTIBULE | Compete by date |
|---|---|---|---|---|
| 1. | | | 1. | |
| 2. | | | 2. | |
| 3. | | | 3. | |
| 4. | | | 4. | |
| 5. | | | 5. | |

1. Office complete(incl. desk, shelf, dead bolt lock, door closure and peep site). ___

2. **Office lights:**
   Installed ___ 0
   Operational ___ 0

3. Are there any roof leaks in the Office? ___

4. Toilet rooms operational with a min of 20 gal water heater installed ___

5. Hand sink(s) installed to meet ADAAG requirements. ___

6. Are the Toilet room shelves, grab bars, mirror, hand dryers installed. ___

7. **Toilet room lights:**
   Installed ___ 0
   Operational ___ 0

8. Are there any roof leaks in the Toilet room? ___

9. **Vestibule lights and emergency lights**
   Installed ___ 0
   Operational ___ 0

10. Drinking fountain and mop sink installed? ___

11. Are there any roof leaks in the Vestibule? ___

12. Are there any sub-meters for power ___

13. Interior door closure pressures (5# max ):
    Office ___
    Toilet rooms ___
    Others ___

14. Exterior door closure pressures (10 - 15# max.):
    Front doors ___
    Rear doors ___

**Store Maintenance Information**

1. Fire Alarm System: ___

2. Fire Sprinkler System: ___

3. Irrigation for Exterior Landscaping: ___

4. Automatic Doors: ___

5. If the building is free-standing, are there gutters and downspouts? ___

Each item listed should have and answer in the box provided (Yes, No or NA).
Never leave a box empty. If an explanation is required, one needs to be
provided.

INITIAL HERE

**Exhibit D-4  - Punch List Procedures**
**Page 3 of 3**

**EXHIBIT E – DELIVERY NOTICE**

To:        Family Dollar Construction Department
Attention: Construction Project Manager

Re:        Lease Agreement between ALEXANDRIA VENTURES II, LLC, as Landlord, and
FAMILY DOLLAR STORES OF GEORGIA, INC., as Tenant, for a new Family
Dollar Store located on the northern side of Snapfinger Road, east of its
intersection with Wesley Chapel Road in the City of Decatur, County of De Kalb,
State of Georgia **(Family Dollar Project #500160).**

Landlord hereby certifies that as of this date:  (i) all driveways, service areas and parking areas
are complete with a final topcoat (gravel is not acceptable); (ii) all necessary utilities including but
not limited to water, sewer, gas and electric are connected (including meters) and are operational;
and (iii) all building and road signs have been approved by Tenant and are installed (including
completion of electrical connections) and operational.  Landlord further certifies that construction
of the building landscaped areas, storm sewer, water retention areas and irrigation system, if
applicable, will be substantially complete pursuant to Paragraph 5 of the Lease and the Demised
Premises will be delivered to Tenant along with a certificate of occupancy on or before
_____ / _____ / _____ (the "Delivery Date").

Landlord understands that Tenant will rely on this Delivery Notice to prepare to open its business
at the referenced location and that the Lease Agreement provides for compensation to Tenant in
the event Landlord fails to deliver a fully completed project to Tenant on or before the Delivery
Date.

                                      LANDLORD
                                      ALEXANDRIA VENTURES II, LLC

        (SEAL)

                                        By:_____
                                           Charles Asensio
                                      Title:  Managing Member
                                      Date: _____

This Delivery Notice must be sent by one of the following:
Certified Mail, return receipt requested to:
                    Family Dollar Construction Department
                    P. O. Box 1017
                    Charlotte, NC 28201-1017
Or Commercial Delivery Service to:

                    Family Dollar Construction Department
                    10301 Monroe Road
                    Matthews, NC 28105
Or Facsimile to:
                    Family Dollar Construction Department
                    704-814-4282
Send copy to:
**_BTS Project Manager Name_**             **EXHIBIT E – DELIVERY NOTICE**



## Family Dollar Signage Guidelines

**A. General Information:**

1. The Landlord will be required to provide a Preliminary Signage Code Check and Signage Site Plan to the Family Dollar Real Estate Manager for submission and company approval (see attached). The Preliminary Signage Code Check form must be completely filled out. The Family Dollar Real Estate Manager will be responsible for reviewing the form prior to submission. The Signage Site Plan should show all signage to be used on this site. The signage indicated on the Signage Site Plan should match the Preliminary Signage Code Check form for quantity, size and location (see attached).

2. The Landlord will be responsible for the cost of Code Checks, permitting (i.e. signage and electrical variances (if required), installation (i.e. foundations, footer, masonry surrounds, etc.) and final electrical connection for the Family Dollar signage.

3. Family Dollar will manufacture and ship (at Family Dollar cost) the required signage to the Landlord's sign installer for each Family Dollar location, including sign pole (excluding multi-tenant road signage or panel in existing Road Sign).

4. Signs will be selected by Family Dollar and the Landlord from the Family Dollar standard signage (see attached). If, through the Code Check process, Family Dollar standard signage cannot be permitted, non-standard signage must be noted as part of the lease, and the Landlord must clearly indicate this on the Code check form. The type and size that is permittable must be indicated on the Code Check form and Signage Site Plan. Along with this information, the Landlord will need to provide the information required for variance in order to install Family Dollar standard signage (see Code Check form).

5. Approved signage should be indicated on the Landlord's Architectural Plans and permitted with the building.

**B. Banners:**

1. Upon completion of the lease, Family Dollar will forward a "Coming Soon" banner to the Landlord at the address indicated in the lease. The Landlord will be responsible for permitting and installation of the banner at the start of site construction. Please note on the Code Check form if there is any reason why the banner should not be installed once the lease is final. Banner should be located in a conspicuous location on site, preferably the future site of the road sign.

2. Landlord is responsible for the removal and disposal of the Banner upon the completion of installation of the permanent Road Sign.

**C. Multi-Tenant Road Signs:**

1. If a multi-tenant Road sign is to be constructed, or if panels are being added to an existing multi-tenant Road Sign, the Landlord will be responsible for all permitting, manufacturing and installation. Family Dollar will provide our standard graphics and specifications. Approved and signed drawings are required for multi-tenant Road Sign and for any custom sign (not part of the Family Dollar Standard Signage Package).

**D. Ordering Signage:**

1. No signage may be ordered until the signage is fully permitted. Landlord must use the Family Dollar Order Form to place all orders. Landlord must submit a completed order form along with a copy of the sign permit and approved site plan. Landlord will send the Order Form to fdsbir@familydollar.com (preferred) or faxed to 704-814-6262. Family Dollar will review the order for completeness and consistency with the approved signage for the project. Once approved, FDS will send the order to Family Dollar's sign vendor to be placed into production (please note if Order Form is not complete or inaccurate a delay in delivery is possible). Note: This must be sent directly to Family Dollar, not one of our sign companies.

2. Note: lead-time for standard and custom signs. It is the Landlord's responsibility to send the sign Order Form to Family Dollar to allow enough lead-time to give notice of delivery.

**E. Installation:**

1. Upon receipt of product, Landlord must inspect for visible damage while driver is present and note any defects on the paperwork. Do not sign without noting visible damage. Product must be inspected for hidden damage within three (3) days of receipt. If the product is damaged in shipment, a freight claim must be filed in accordance with carrier's requirements. Contact sign vendor immediately for help in filing a claim. (If signs are shipped to the job site, per Landlord instruction, the Landlord must provide means to unload delivery.

2. The Landlord will be responsible for the installation of all signage. The Landlord's Structural Engineer will ensure that all required backing/structural support is provided and installed properly. The Landlord will be responsible for painting (to include cost) of the structural component (i.e., pylon pole).

3. Landlord will be required to provide pictures of the completed installation of all signage with Milestone 4 as indicated on lease Exhibit D-2.

4. If the Landlord needs assistance with Preliminary Signage Code Check, permits or installation, they may contact Family Dollar's preferred sign vendors for description of services and costs. Landlord must understand their use of these vendors is at the discretion of the Landlord, and the Landlord will be responsible for any associated costs for their services.

| Allen Industries | SignResource |
|---|---|
| Allen Industries | SignResource |
| Heather Surratt | Jeff Ogle |
| 1-800-967-2553 Ext. 3014 | 1-800-423-4283 Ext. 3402 |
| 6434 Burnt Poplar Road | 701 Scarboro Road, Suite 230 |
| Greensboro, NC 27409 | Oak Ridge, TN 37830 |

If there are any questions or comments, p...

**Exhibit F - Family Dollar Signage Guidelines**
**Lease Agreement Dated:** _7-9-10_
**Project #500160 - Decatur, GA**

INITIAL HERE



**Exhibit F - Family Dollar Signage Guidelines**
**Page 2 of 2**

PLEASE NOTE:  IT IS EXTREMELY IMPORTANT TO INDICATE THE LOCATION AND SIZE OF SIGNAGE THAT CODE WILL ALLOW ON THE "SIGNAGE SITE PLAN #1" (ABOVE ON LEFT).  IF YOU FEEL LARGER OR ADDITIONAL SIGNAGE WILL BE APPROVED THROUGH A VARIANCE PROCESS OR OTHER METHOD, PLEASE INDICATE THAT INFORMATION ON THE "SIGNAGE SITE PLAN #2" (ABOVE ON RIGHT).

ATTACHMENT B                                                                                                 REV:  09/01/06



**Exhibit F-1 - Signage Order Form**

Lease Agreement Dated: _____ 7-9-10

Project #500160 - Decatur, GA

INITIAL HERE

# FAMILY ⋒

## PRELIMINARY CODE CHECK
Rev 1 - Sept 1, 2008  Rev 2 - April 17, 2009

Company Name _____

Codes Checked by/Phone Number _____

Date Information Collected _____

Address _____

City _____ State _____

ZIP Code _____

Project Number _____

Zoning Classification _____

Codes Attached?   Yes _____   No _____

Link to codes if available _____

Comments _____

Contact Person _____

Phone Number _____

Fax Number _____

E-mail Address _____

If no, explain _____

Comments _____

How is square footage allowance calculated? _____

Quantity Allowed _____

Is the maximum square footage total listed below equal to _____ One Side _____ Both Sides

Maximum Square Feet _____

Max. Sq. Ft. _____   Max. Qty. Allowed _____

Largest standard Building Sign that can be installed (indicate letter and size)? _____

Largest standard Road Sign that can be installed (indicate letter and size)? _____

Maximum Projection _____

Maximum Over All Height _____

Street fronts Only?   Yes _____   No _____

Minimum Clearance _____

### UNDERCANOPY
### SETBACKS

Undercanopy Allowed   Yes _____   No _____   Front _____   Side _____

Can't exceed Bldg Max Sq Ft?   Yes _____   No _____   Site Triangle _____

Min Clearance Required _____

Comments _____

Comments _____

Attachment C - Preliminary Code Check Form

Page 1

4/17/2009

---

**Exhibit F-2 - Preliminary Code Check Form**
**Lease Agreement Dated:** 7-9-10
**Project #500160 - Decatur, GA**

Page 1 of 3

(INITIAL HERE stamp)

**FAMILY** 
PRELIMINARY CODE CHECK
Rev 1 - Sept. 1, 2008  Rev 2 - April 17, 2009

*Note: If FDS minimum size requirements for a building sign (98.88 SF) and Road Sign (30 SF) are NOT achievable based on the investigation for this site, the Landlord will be required to apply for a variance.*

<u>ITEMS REQUIRED TO SECURE PERMITS:</u>

Scaled Site Plan _____     Property ID Number _____

Elevation _____     Authorization Letter _____

Legal Description _____     By Whom? _____

Tax Parcel ID _____     Engineering _____

Permits Required _____

City _____ County _____ State _____

Time to Secure Permit _____

Permit Expiration _____

<u>VARIANCE INFORMATION</u>     BLDG _____     RS _____

What is normal time frame? _____

Cost to file: _____     Representative Req'd to Attend? _____

Next Application Deadline: _____     Next Meeting Date _____

Attempt Permit First? _____     Permit Req'd After Variance? _____

Possibility of a variance

Good _____ Fair _____ Poor _____

*Note documents required for variance under COMMENTS section.*

<u>BANNER</u>     FDS will forward the 'Coming Soon' banner when the Lease is finalized.

Are there any reason why the banner should not be installed when the Lease is complete?

NO _____ YES _____ If Yes, explain. _____

Note: This code check is based on the given physical address noted above.

_____
_____
_____
_____
_____
_____
_____
_____
_____

**Exhibit F-2 - Preliminary Code Check Form**
**Page 2 of 3**

INITIAL HERE



Visual comparison to match codes of what is allowed for the proposed site:
indicate with an 'X' which signs are to be used on the project.



Attachment C - Preliminary Code Check Form

Page 3

4/17/2009

Exhibit F-2 - Preliminary Code Check Form
Page 3 of 3

## Exhibit G

## Family Dollar Stores, Inc.
Post Office Box 1017
Charlotte, NC  28201-1017

### AUTOMATED CLEARING HOUSE (ACH) DIRECT DEPOSIT AUTHORIZATION FORM

LANDLORD'S NAME (MUST MATCH THE NAME ON THE LEASE OR LANDLORD MUST
PROVIDE EVIDENCE THAT LANDLORD OWNS THE PROPERTY AND IS ENTITLED TO
RECEIVE THE RENT):

_____

NAME ON THE ACCOUNT, IF DIFFERENT FROM LANDLORD NAME:

_____

ACCOUNT #_____

LANDLORD'S TAX ID
NUMBER:     _____

ADDRESS:     _____

                    _____

                    _____

TELEPHONE #_____

E-mail Address: _____

Landlord requests that Tenant enter Landlord into Tenant's Direct Deposit Program so
that payments due to Landlord under the Lease will be made by direct deposit into
Landlord's checking account.  Landlord understands and agrees that:

1.  Tenant will decide whether to enter Landlord into Tenant's Direct Deposit Program.

2.  If Landlord is in the program, all payments due Landlord under the Lease will be
    made via Direct Deposit.  For example, Tenant will not be able to pay rent through
    direct deposit and real estate tax reimbursements by check.

3.  Landlord authorizes Tenant to initiate electronic credit entries into the designated
    account.  Landlord also authorizes Tenant to initiate debit entries and adjustments
    for any credit entries to which Landlord is not entitled for any reason including
    errors made by Tenant.

4. Landlord agrees to notify Tenant immediately via e-mail at_____
   and via written notice sent in accordance with the Notices Paragraph of the Lease
   if Landlord is no longer entitled to receive payments due under the Lease.

5. Tenant will not be responsible for any late payments caused by Landlord's closing
   the designated account.  Landlord must provide a new signed ACH Direct Deposit
   Form in order to change its designated account.

**Attach voided check here.**

Landlord:
Name: _____

By:   _____
      Print Name: _____
      Title: _____
      Date: _____



**EXHIBIT H**
(Outparcel)


All that tract or parcel of land lying and being in Land Lot 126 of the 15th Land District of DeKalb County, Georgia and being more particularly described as follows:

Beginning at a point marked by a right of way monument along the northeasterly right of way of Snapfinger Road, as said Snapfinger Road right of way was reconfigured by virtue of condemnation proceedings identified as DeKalb County Superior Court Civil Action 08CV2512-2, said right of way monument being located at a point along the easterly boundary of the property now or formerly of Joseph and Gladys Grimaud and being approximately 160 feet east-southeasterly from the easterly right of way of Wesley Chapel Road; running thence north 4 degrees 14 minutes 21 seconds west a distance of 71.32 feet to a point; running thence north 87 degrees 19 minutes 14 seconds east a distance of 256.37 feet to a point; running thence south 2 degrees 40 minutes 46 seconds east along the boundary with property now or formerly owned by Golden Glide, Inc. a distance of 175.58 feet to a point; running thence north 88 degrees 35 minutes 21 seconds east a distance of 25.25 feet to a one-half inch rebar found; running thence south 3 degrees 38 minutes 38 seconds east a distance of 57.54 feet to a point located along the relocated northeasterly right of way of Snapfinger Road; running thence north 62 degrees 37 minutes 44 seconds west a distance of 324.22 feet to the Point of Beginning, as shown on boundary/as-built and topographic survey for ALEXANDRIA VENTURES II, LLC prepared by Diversified Technical Group, LLC, Dacula, Georgia, Jay Scott Smith, Georgia Registered Land Surveyor dated March 22, 2010 (Project No. 10103).



After recording, return to:

## RECIPROCAL EASEMENT AND COVENANTS AGREEMENT

THIS RECIPROCAL EASEMENT AND COVENANTS AGREEMENT (hereinafter referred to as this "Agreement"), is made and entered into on July ____, 2010, by and between **Snapfinger Plaza II, LLC**, a Georgia limited liability company (hereinafter referred to as the **"Center Owner"**) and **Alexandria Ventures II, LLC**, a Georgia limited liability company (hereinafter referred to as the **"Neighbor"**); the Center Owner and the Neighbor are hereinafter sometimes referred to individually as a "Party" and collectively as the "Parties").

### WITNESSETH

WHEREAS, the Center Owner is the owner of (i) that certain improved  parcel of land commonly known as "Snapfinger Plaza Shopping Center", as more particularly described on **Exhibit "A"** attached hereto and by this reference made a part hereof (hereinafter referred to as the **"Shopping Center"**), and (ii) of easement encroachment rights for the installation and maintenance of a multi-tenant monument sign at the northwesterly corner of the intersection of Snapfinger Road and "Post Office Drive", such area being more particularly described in the easement encroachment provisions set forth in paragraph (9) of that Consent, Final Order and Judgment entered by the Superior Court of DeKalb County in Civil Action 08CV4043-4 and the right of permission for use thereof, a copy of which is attached hereto as **Exhibit "B"** and by this reference made a part hereof;

WHEREAS, the Neighbor is the owner of that certain site located on the south side of the Shopping Center, more particularly described on **Exhibit "C"** attached hereto and by this reference made a part hereof, less and except such portions thereof as have been subject to a road widening condemnation by the Georgia Department of Transportation (hereinafter referred to as the **"Outparcel"**). The Shopping Center and the Outparcel are hereinafter sometimes

Exhibit I
Decatur, GA #500160
consisting of 13 pages plus exhibits

individually or collectively referred to as the **"Properties"**);

WHEREAS, the Center Owner desires to establish an easement, for the benefit of the Outparcel for (A) pedestrian and vehicular access, ingress and egress to and from Post Office Drive, a dedicated public right-of-way of DeKalb County, Georgia, and for parking over and across the paved areas of the Shopping Center (the **"Easement Area"**); (B) for construction of a dumpster pad and maintenance of up to two dumpsters upon the Easement Area immediately adjacent to the Outparcel; and (C) for the right to install and maintain a directional sign at the intersection of Post Office Drive with the Shopping Center ("Sign #2" on **Exhibit "D"**), a sign panel upon a multi-tenant pole sign located upon the Shopping Center along Wesley Chapel Road ("Sign #1" on Exhibit "D"), and a sign panel upon a multi-tenant monument sign located upon the easement encroachment area identified as the "DOT Encroachment Project" on Exhibit "D" hereto;

WHEREAS, the Parties desire to set forth certain restrictions with respect to the compatible use of the Shopping Center in relation to be contemplated use of the Outparcel;

WHEREAS, in consideration of the foregoing rights in favor of Neighbor, the Neighbor desires to establish, for the benefit of the Shopping Center, an easement for pedestrian and vehicular access, ingress and egress to and from the Shopping Center and Snapfinger Road; and

WHEREAS, the Parties wish to provide for the continued maintenance of improvements to the Easement Area and Sign Easement Tract, as defined in Section 2.1.

NOW, THEREFORE, for and in consideration of the foregoing premises, the sum of Ten Dollars ($10.00) and other valuable considerations, the receipt and sufficiency whereof are hereby acknowledged, the Center Owner and the Neighbor hereby agree as follows:

1. *Grant of Easements over the Easement Area.* The easements granted, conveyed, declared, created, imposed and established by the Center Owner over the Easement Area shall be as described in Sections 1.1 through 1.2 hereof. The easements granted, conveyed, declared, created, imposed and established by the Neighbor over the Outparcel shall be as described in Section 1.3 hereof.

1.1 Easements over the Easement Area. The Center Owner, as owner of the Easement Area, hereby grants, conveys, declares, creates, imposes and establishes on a perpetual, non-exclusive basis:



(a) a right-of-way easement for vehicular and pedestrian access, ingress and egress over and across all portions of the Easement Area that are not striped for vehicle parking, for use by the Neighbor for the purpose of pedestrian and vehicular ingress and egress to and from the Neighbor Parcel and the westerly terminus of Post Office Drive, as shown on Exhibit "D" hereto; and

(b) for parking of vehicles of customers patronizing the Outparcel in those portions of the Easement Area that are striped for vehicle parking; and

(c) for construction of a dumpster pad and maintenance of up to two  dumpsters thereon within the Easement Area immediately adjacent to the Outparcel at the southeastern-most corner of the Shopping Center; and

(d) parking of delivery and refuse trucks immediately before and after making pickups and deliveries to the improvements upon the Outparcel from time to time, provided that such truck parking shall be restricted to that portion of the Easement Area that is located within the southerly-most area of the Easement Area extending eighteen (18) feet north from the southern boundary of the Shopping Center and extending west no more than 100 feet from the southeasternmost corner of the Shopping Center (as shown as the "Truck Parking Area" on Exhibit D).

1.2 Relocation and Additional Improvements. In order to assure to the Neighbor adequate beneficial use of the Easement Area as intended, the Center Owner shall not at any time (a) construct any additional buildings, kiosks, curbing, landscaping or other structures and improvements within the Easement Area or (b) alter the location of entrances, exits, driveways and parking layout within the Easement Area without the express written consent of the Neighbor, which shall not be unreasonably withheld or delayed.

1.3 Easements over Outparcel. The Neighbor, as owner of the Outparcel, hereby grants, conveys, declares, creates, imposes and establishes on a perpetual, non-exclusive basis a right-of-way easement for vehicular and pedestrian access, ingress and egress over and across all portions of the Outparcel that are not improved from time to time, for the purpose of pedestrian and vehicular ingress and egress to and from the Shopping Center and Snapfinger Road.

2. *Grant of Sign Easements.*

2.1 Sign Easement. The Center Owner hereby grants, conveys, declares, creates, imposes and establishes the following rights and easements in favor of the Neighbor to install,

3



maintain, repair and replace:

(a) a sign panel upon a multi-tenant monument sign located upon the Shopping Center along Wesley Chapel Road, substantially at the location shown as "Sign #1" on Exhibit "D" hereto and

(b) a directional sign at the intersection of Post Office Drive with the Shopping Center ("Sign #2" on Exhibit "D"); (all of such locations being referred to herein as the "Sign Easement Tracts"); and

(c) a sign panel upon a multi-tenant monument sign as may be located upon an easement encroachment area appurtenant to the  Shopping Center to be located on the northwesterly corner of the intersection of Post Office Drive and Snapfinger Road, being identified as the "DOT Encroachment Project" on Exhibit "D" hereto.

Such sign panels shall be limited to the identification of a single business that is engaged or is about to engage in the active conduct of business upon the Neighbor Parcel and shall further comply with all laws and regulations governing signs at such locations. All expenses associated with the production, installation and removal of such sign panels shall be the exclusive responsibility of the Neighbor. Neighbor shall have no authority to bind the Center Owner or any of its property with responsibility for any expenses or liens in respect thereto concerning use of the Sign Easement Tracts, improvements thereto or installation of sign panels thereon.

3. *Maintenance of the Easement Area and Sign Easement Tract.* The maintenance and expenses associated with of the Easement Area and the Sign Easement Tract and the allocation and payment of expenses incurred in connection therewith shall be as described in Sections 3.1 through 3.6 hereof.

3.1 Maintenance. The Center Owner shall be responsible for performing maintenance of the Easement Area and the Sign Easement Tracts. Such maintenance shall include: (i) keeping the Easement Area free of any obstructions at all times, except in the event of emergencies; (ii) removing trash and debris; (iii) landscaping; (iv) resurfacing, repairing and replacement of parking and other surfaces; and (v) maintenance and replacement of traffic signs and other markings, and any proprietary sign structure serving improvements constructed on the Shopping Center and the Outparcel. The Center Owner shall be responsible for performing all maintenance of the Shopping Center without contribution from the Neighbor except to the extent expressly provided by this Agreement. Notwithstanding the foregoing, all expenses associated with construction, maintenance, repair, refuse removal and cleanup associated with the dumpster



pads and dumpsters installed by Neighbor shall be the exclusive responsibility and expense of the Neighbor. Neighbor shall be responsible for performing all maintenance of the Outparcel, without contribution from the Shopping Center.

3.2 Insurance. The Center Owner shall obtain and keep in force with respect to the Shopping Center a commercial general liability insurance policy with limits of not less than $2 million for each occurrence and $4 million general aggregate against liability for bodily injury, death and property damage occurring on or involving the Shopping Center (including without limitation or exception, parking areas, driveways, ramps, curbs, drains, etc.). Such policy shall insure the Center Owner and the Neighbor with respect to the Shopping Center, as their interests may appear. Upon written request of the Neighbor, tenants of the Outparcel shall also be named as additional insured under such commercial general liability policy but only for claims against such tenant arising out of the acts or omissions of the Center Owner, including acts arranged by the Center Owner, or arising from the Center Owner's management, use, maintenance or control of the Easement Area. All premiums and deductibles with respect to such policy shall be the sole responsibility of the Center Owner.

3.3 Ad Valorem Taxes. Each Party shall timely pay all real property taxes assessed against their respective Properties subject to this Agreement, without contribution from the other Party.

3.4 Assessments for Certain Repairs. Neighbor shall contribute 100% of all direct and indirect costs of repairing any damage to the Easement Area or the Sign Easement Tract that is caused exclusively by the Neighbor or caused by the failure of the Neighbor to properly maintain, keep clean and free from being a nuisance the dumpster pad and areas adjacent thereto in respect to the use and maintenance of such dumpsters. The charges provided for by this section are referred to herein as an **"Assessment"**.

3.5 Collection of Assessments. Any Assessment not paid within 30 days after written demand shall bear interest at the annual interest rate of 10% per annum from the due date thereof, together with all costs and expenses of collection, including reasonable actual attorney's fees and court costs, and the Center Owner shall have the right to bring suit against the Neighbor to recover a money judgment for all such amounts without foreclosing or waiving the liens securing same as provided for in this section.

3.6 Assessment Lien and Foreclosure.  All sums assessed in the manner provided in this Agreement but unpaid, together with interest thereon and costs of collection, including attorney's fees as provided above, shall become a continuing lien in charge on the Outparcel

5

covered by such Assessment, which shall bind such Outparcel in the hands of the Neighbor, and its successors and assigns.  Such lien shall be superior to all other liens and charges against the Outparcel, except that such lien shall automatically be subordinate and inferior to: the lien for ad valorem taxes; any deed to secure debt of record securing sums borrowed from an institutional lender for the acquisition or improvement of the Outparcel and any refinancing thereof; and the lease of any portion of the Outparcel, or any leasehold deed to secure debt of record securing sums borrowed from an institutional lender for the acquisition or improvement of any portion of the Outparcel.  The Center Owner shall have the power to release the assessment lien or to subordinate to any other lien in such power shall be entirely discretionary with the Center Owner.  To evidence the assessment lien, the Center Owner shall prepare a written notice of assessment lien setting forth the amount of the unpaid indebtedness, the date that the unpaid indebtedness was due, the name of the owner of the Outparcel covered by such lien.  Such notice shall be signed by the Center Owner and may be recorded in the office of the Clerk of the Superior Court in the county where the Outparcel is located.

    4. *Use Restriction.*

        4.1 Shopping Center Restricted Use. So long as the Outparcel is subject to rights of use by Family Dollar and Family Dollar has not permanently closed its business on the Outparcel, the Shopping Center shall not be used in whole or in part for any of the following uses: variety store, discount department store, dollar store, liquidation store, close-out store or thrift store or variety discount store, any store selling used clothing, or any store similar to Family Dollar in operation or merchandising, or as a theater; bowling alley; bingo parlor; game arcade; bar, tavern, lounge or nightclub; any establishment featuring or selling as a substantial part of its business "adults only" or X-rated books, magazines, videotapes, video disks or novelties; a gym or fitness center; a car dealership or used car lot; a restaurant exceeding 4,000 sft. of rentable space or an office exceeding 4,000 sft. of rentable space (excluding the U.S. Post Office). The provisions of this paragraph are not intended to restrict the Shopping Center from use as by a drugstore, toy store, hobby store, sporting goods store, card and gift store, hardware store, home improvement store, auto supply store, electronics store, office supply store or any other store selling a single category of merchandise even though the category may be a broad one such as toys or hardware.

    5. *Miscellaneous Provisions.*

        5.1 Arbitration. Any dispute between the Parties arising under this agreement shall be settled by arbitration. Such arbitration proceedings shall be conducted according to the following procedure:

(a) A Party shall notify the other Party in writing of the exact matter in dispute and of the name of the arbitrator appointed by the Party giving such notice. Within ten (10) days after receipt of such notice, the Party so receiving it shall, in writing, notify the other Party of an arbitrator appointed by it. Within thirty (30) days after the appointment of the second arbitrator, the arbitrators so appointed shall determine the matter in dispute, or failing so to determine the matter in dispute or agree upon a third arbitrator within thirty (30) days after the appointment of the second arbitrator, then both Parties or either of them shall immediately, by petition to the JAMS/Endispute, or its successor, request the appointment of five (5) persons, each of whom shall be qualified to serve as a third arbitrator, and none of whom shall have any interest in or be in any way affiliated with or related to either Party as a stockholder, officer, employee or agent of any Party, or a relative of any such person. From the five (5) persons thus appointed, each Party shall, within fifteen (15) days after such appointment, alternately strike two names each, the Party who initiated the arbitration striking one first. The remaining person shall act as the third arbitrator. If either Party shall fail or refuse to appoint an arbitrator within the time provided, then the other Party shall petition the JAMS/Endispute, or its successor, to appoint an arbitrator for the Party so failing or refusing and any arbitrator so appointed shall be considered as having been appointed by the Party so failing or refusing to appoint an arbitrator. If either Party shall fail or refuse within the time provided to strike from the list of the five (5) persons appointed by the court as set forth above, the other Party shall proceed to select the third arbitrator from said list.

(b) After a third arbitrator has been appointed as provided above, the arbitrators shall hold such meetings as any Party may reasonably request and at such meetings hear and consider any evidence which a Party desires to present. Within thirty (30) days after the appointment of the third arbitrator, the arbitrators, or any two thereof, shall make their determinations.

(c)    All determinations made by the arbitrators shall be in writing, signed by at least two arbitrators. Such written determinations shall be in all respects final. No Party shall have any right to appeal therefrom to the courts or otherwise, and judgment upon the determination may be entered in any court of competent jurisdiction.

(d) Each Party shall pay the fees and expenses of the arbitrator appointed by it. The fees and expenses of the third arbitrator shall be divided equally between the Parties. Any fees and expenses charged by the JAMS/Endispute shall be divided equally between the Parties.

7

(e) All arbitrators shall be chosen from a class of disinterested experts qualified by education, training and/or experience to resolve the particular issue in dispute in an informed and efficient manner.

(f) In the event the JAMS/Endispute, or its successor, is requested to designate an arbitrator or arbitrators as aforesaid, and declines to do so, then the entire issue to be arbitrated may be submitted by either Party to the JAMS/Endispute, or its successor, for binding arbitration.

5.2 Extent of Usage Rights. The easements herein granted shall be interpreted to permit joint usage of each easement area by (i) the Center Owner and the Neighbor, (ii) the legal representatives, successors and assigns of the Center Owner and the Neighbor, (iii) invitees of the Center Owner and the Neighbor, (iv) tenants and future owners of any portion of the Shopping Center or the Outparcel, and (v) customers and invitees of any such tenants and future owners. Notwithstanding the foregoing, all rights, benefits, duties and obligations afforded by this Agreement, including the right to amend this Agreement, shall be vested exclusively in the record title holders from time to time of the fee simple interest of the Shopping Center and the Outparcel.

5.3 Reservation of Rights. The Center Owner hereby expressly reserves for itself, its successors and assigns, all rights and privileges incident to the ownership of the fee simple estate of the Easement Area and the Sign Easement Tract which are not inconsistent with the rights and privileges herein granted, including, without limitation, (i) the right to construct and maintain one or more proprietary signs on the Easement Area and (ii) the right to grant additional non-exclusive easements to third parties, over, under and across the Easement Area. No easement is implied for purposes other than those expressly set forth herein, including but not limited to installation of utilities, drainage, slopes. Anything contained herein to the contrary notwithstanding, the Center Owner shall have the right to convey or cause to be conveyed to any person all or any portion of or further interest in the Easement Area subject nevertheless to this Agreement.

5.4 Limitation upon Liability. Notwithstanding any other provision contained in this Agreement to the contrary, any liability of the Parties under this Agreement shall be limited solely to its interest in their respective Properties. In any action or proceeding brought against a Party or related to the acts, duties or obligations of a Party, as the case may be, hereunder, any judgment or decree against such Party shall be enforceable against such Party only to the extent of their interest in the Property owned by such Party and such judgment shall not be subject to

8

execution nor be a lien upon any other asset or the property of such Party.

5.5 Recording and Filing. A counterpart of this Agreement shall be recorded in the Office of the Clerk of the Superior Court of the County of DeKalb, State of Georgia, or in such other office as may at the time be provided by law as the proper place for recordation thereof

5.6 Notices. Each notice to either Party concerning the subject matter of this Agreement shall be in writing and shall be deemed to have been properly given or served by the deposit of such with the United States Postal Service, or any official successor thereto, designated as registered or certified mail, return receipt requested, bearing adequate postage and addressed as hereinafter provided. Each notice shall be effective upon being deposited as aforesaid and shall be deemed to have been received five (5) business days from and after such deposit. Each notice may also be served by personal service addressed as hereinafter provided. By giving to the other Party at least ten (10) days notice thereof, either Party shall have the right from time to time to change the address(es) thereof and to specify as the address(es) thereof any other address(es) within the United States of America. Notices shall be addressed as provided in Subsections 5.6.1 and 5.6.2.

5.6.1 *To the Center Owner.* Each notice to the Center Owner shall be addressed as follows:

> Snapfinger Plaza II, LLC
> Attention: William T. Fricke
> 2344 Perimeter Park Drive, Suite 100
> Atlanta, GA   30321

5.6.2 *To the Neighbor.* Each notice to the Neighbor shall be addressed as follows:

> Alexandria Ventures II, LLC
> Attn: Gerald R. Stinnett
> The Gates at Sugarloaf
> 1325 Satellite Blvd., Suite 1001
> Suwanee, GA 30024

All notices provided to the Neighbor shall be provided to any identified tenant of the Neighbor

9



with respect to the Outparcel provided such tenant has first provided written notice to the Center Owner of a request for such notices, provided, nevertheless, that failure to give notice to such tenant shall not impair the validity of notice given directly to the Neighbor and the Center Owner shall be responsible only for any actual direct damages occasioned by failure or delay in giving such notice to such tenant.

5.7 Waiver. No consent or waiver, express or implied, by any Party to or of any breach or default by any other Party in the performance by such other Party of the obligations thereof under this Agreement shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other Party of the same or any other obligations of such other Party under this Agreement. Failure on the part of any Party to complain of any act or failure to act of any other Party or to declare such other Party in default, irrespective of how long such failure continues, shall not constitute a waiver of such Party of the rights thereof under this Agreement.

5.8 Severability. The Parties expressly acknowledge and agree that the primary purpose of this Agreement is the grant, conveyance and establishment of the easements, rights and privileges set forth herein, and any provisions with respect to the use of the Shopping Center that may now or in the future be subject to O.C.G.A. §44-5-60, or any similar law or statute, are severable from provisions with respect to the easement rights set forth in this Agreement. Each Party (knowingly, willingly and upon the advice of legal counsel) expressly forever waives, releases and discharges any right that either Party now has or ever may have to claim or assert in any legal or other circumstances that any of the easements or other terms or provisions of this Agreement are in any way covered or limited by said section or any similar law or statute. Furthermore, if any provision of this Agreement or the application thereof to any entity or circumstances shall be invalid or unenforceable to any extent, the remainder of this Agreement and the application of such provisions to any other entity or circumstance shall not be affected thereby and shall be enforced to the greatest extent permitted by law.

5.9 Status Reports. Recognizing that any Party may find it necessary from time to time to establish to third parties such as accountants, banks, mortgagees or the like, the then current status of performance hereunder, the Parties each agree, upon the written request of the other Party, made from time to time by notice, to furnish promptly a written statement (in recordable form, if requested) on the status of any matter pertaining to this Agreement to the best of the knowledge and belief of the Party making such statement.

5.10 Amendment. Neither this Agreement nor any provision hereof may be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by



the Party against whom enforcement of the change, waiver, discharge or termination is sought.

5.11 Terminology. All personal pronouns used in this Agreement, whether used in the masculine, feminine or neuter gender, shall include all other genders; the singular shall include the plural; and the plural shall include the singular. Titles of Articles and Sections of this Agreement are for convenience only, and neither limit nor amplify the provisions of this Agreement, and all references in this Agreement to Articles, Sections or Subsections thereof shall refer to the corresponding Article, Section or Subsection of this Agreement unless specific reference is made to the articles, sections or subdivisions of another document or instrument.

5.12 Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which together shall comprise but a single instrument.

5.13 Binding Agreement. The provisions of this Agreement shall run with the land and apply to, inure to the benefit of and bind the Parties and the respective successors and assigns thereof. Whenever in this Agreement a reference to any Party is made, such reference shall be deemed to include a reference to the heirs, executors, legal representatives, successors and assigns of such Party.

5.14 Interpretation. No provision of this Agreement shall be construed against or interpreted to the disadvantage of any Party by any court or other governmental or judicial authority by reason of such Party having or being deemed to have structured or dictated such provision.

5.15 Governing Law. This Agreement and the obligations of the Parties hereunder shall be interpreted, construed and enforced in accordance with the laws of the State of Georgia.

5.16 Relationship of Parties. No express or implied term, provision or condition of this Agreement shall be deemed to constitute the Parties as partners or joint venturers.

Schedule of Exhibits:

Exhibit A: Description of Shopping Center
Exhibit B: Easement Encroachment Permission (P.O. Drive Sign)
Exhibit C: Description of the Outparcel
Exhibit D: Multi-parcel Site Plan With Notations

11

IN WITNESS WHEREOF, the Center Owner and the Neighbor have executed this Agreement under seal as of the day and year first above written.

"Center Owner"
Snapfinger Plaza II, LLC


By: _____
Charles Asensio, Managing Member




Signed, sealed and delivered in the presence of:

_____
Unofficial Witness

_____
Notary Public

Commission Data:

(NOTARIAL SEAL)



"Neighbor"
Alexandria Ventures II, LLC


By: _____
Charles Asensio, Manager




Signed, sealed and delivered in the presence of:

_____

Unofficial Witness

_____

Notary Public

13



## EXHIBIT A
(Shopping Center)


All that tract or parcel of land lying and being in Land Lot 126 of the 15th Land District of DeKalb County, Georgia and being more particularly described as follows:

To find the True Point of Beginning begin at a point marked by a right of way monument along the northeasterly right of way of Snapfinger Road, as said Snapfinger Road right of way was reconfigured by virtue of condemnation proceedings identified as DeKalb County Superior Court Civil Action 08CV2512-2, said right of way monument being located at a point along the easterly boundary of the property now or formerly of Joseph and Gladys Grimaud and being approximately 160 feet east-southeasterly from the easterly right of way of Wesley Chapel Road; running thence north 4 degrees 14 minutes 21 seconds west a distance of 71.32 feet to a point to the True Point of Beginning; running thence north 4 degrees 14 minutes 21 seconds west a distance of 87.27 feet to a one-half inch rebar found at a point corresponding to the northeasterly corner of the property now or formerly of Joseph and Gladys Grimaud; running thence north 85 degrees 38 minutes 1 second west a distance of 133.17 feet to a point located along the easterly right of way of Wesley Chapel Road; running thence along said easterly right of way of Wesley Chapel Road north 0 degrees 27 minutes 28 seconds west a distance of 263.26 feet to a point located along said right of way at the southeasterly corner of property now or formerly owned by Tucker Federal Savings; running thence south 76 degrees 47 minutes 28 seconds east a distance of 230.24 feet to an iron pin found; running thence north 12 degrees 45 minutes 49 seconds east a distance of 167.43 feet to an iron pin found; running thence south 88 degrees 26 minutes 6 seconds east a distance of 114.92 feet to a point located at the boundary with property now or formerly owned by Golden Glide, Inc.; running thence along said boundary south 2 degrees 40 minutes 46 seconds east a distance of 456.62 feet to a point; running thence south 87 degrees 19 minutes 14 seconds west a distance of 256.37 feet to the True Point of Beginning, as shown on boundary/as-built and topographic survey for Snapfinger Plaza, LLC prepared by Diversified Technical Group, LLC, Dacula, Georgia, Jay Scott Smith, Georgia Registered Land Surveyor dated March 22, 2010 (Project No. 10103).


```
Exhibit A to Exhibit I
Decatur, GA #500160
```

14

IN THE SUPERIOR COURT OF DEKALB COUNTY

STATE OF GEORGIA

DEPARTMENT OF TRANSPORTATION, )
          Condemnor, )
    vs. )
0.229 acres of land; and )
certain easement rights; and )
Snapfinger Plaza, LLC; Marvin )
Hewatt; Metro Atlanta )
Commercial Properties; Good )
Luck Business, Inc.; Main )
Street Bank n/k/a BB & T; ) Case No.: 08CV4043-4
DeKalb County; Crown Central )
Petroleum; Herman Talmadge; )
Morris B. Abram; Inverness- )
Emory, Inc.; Henry B. Sussman, )
Nominee; Sidney H. Newburger; )
Jerry M. Andes; Bertha Barron; )
Lawrence Shamsid-Deen; ES & ES )
Acquisition Corp. d/b/a Swifty )
Serve; Kyung Baek Lee; )
Progressive Energy Concepts, )
Inc.; and Nathaniel Robinson, )
individually
          Condemnee,

## CONSENT, FINAL ORDER AND JUDGMENT AS TO CONDEMNEES

It appearing to the Court upon the stipulation and consent of the parties that:

(1) On or about March 26, 2008 Plaintiff-Condemnor Department of Transportation of the State of Georgia (hereinafter the "Department") filed in this Court its Petition <u>in rem</u> in the above-styled case condemning the property therein described; made and filed its Declaration of Taking against said property; deposited with the Clerk of this Court its estimate of just and adequate compensation for said property in the sum of $111,925.00; and that

Exhibit B to Exhibit I
Decatur, GA #500160
1 (Consisting of 5 pages)

(2)    Service of such Petition and Declaration was made on all parties;

(3)    A copy of the Petition was posted on the bulletin board of the Courthouse and the Clerk's citation was duly published in the official newspaper of Dekalb county, all as required by law;

(4)    Defendant, Snapfinger Plaza, LLC ("Snapfinger") filed a timely Notice of Appeal  contesting the amount of just and adequate compensation for the  taking of said property; and that

(5)    No other Notice of Appeal or other pleading contesting the taking of the property or the amount of just and adequate compensation for said taking has been filed by anyone within the time allowed by law or otherwise; and that

(6)    More than fifteen (15) days have passed since the date of the last advertisement in the official newspaper of Dekalb County, as provided for in O.C.G.A. § 32-3-8(f), Ga. Code Ann. § 95A-606(g); and that

(7)    The parties hereto have agreed that the total amount of just and adequate compensation for all claims which were raised or which could have been raised in connection with this case by Defendants is $165,987.50, meaning that the Department shall deposit into the Registry of the Court the additional sum of $54,037.50 which when added to the $111,925.00, previously deposited in the Registry of the



2

Court shall equate to the sum of $165,987.50, said sum being the total amount of just and adequate compensation established for Condemnees' interests' in this case; and that

(8)    The parties hereto have agreed that all monies deposited into the Registry of the Court in this action along with any and all interest accrued on the monies deposited into the Registry of the Court in this action shall be the property of and distributed instanter to Snapfinger; and that

(9)    The parties have further agreed that Department shall grant a right of encroachment for the placement of signage at the location as shown on Exhibit A hereto within fourteen (14) days of Snapfinger producing to the Department evidence of a right of ownership or permission for the owner of the area to place the agreed signage.

**ACCORDINGLY, IT IS HEREBY ORDERED AND ADJUDGED THAT:**

1.     The Department shall deposit with the Clerk of the Court the additional sum of $54,037.50 which, when added to the $111,925.00 previously deposited into the Registry of the Court will constitute the total just and adequate compensation due for the property rights acquired by Department in this condemnation proceeding for the Defendants and for all claims the Defendants raised or

3

could have raised herein;

2.      Final Judgment in favor of Defendants and as against the Department of Transportation in the amount of $165,987.50 is hereby entered;

3.      That upon the Departments' payment into the Registry of the Court of the additional sum of $54,037.50, all funds on deposit in the Registry of Court in this case, The Clerk shall pay instanter the sum of $165,987.50 plus 100 % of any interest earned shall be paid to Condemnee Snapfinger in care of their attorney, Jason P. Wright & Morris, Manning & Martin, LLP, 1600 Atlanta Financial Center, 3343 Peachtree Rd., N.E. Atlanta, Georgia 30326, all monies on deposit in the Registry the Court in this case, including the sum previously deposited into the Registry of the Court by the Department in connection with the filing of this case, the sum deposited by the Department into the Registry of the Court pursuant to this order, and any and all interest accrued thereon.

4.      That upon the Department's payment into the Registry of the Court in the sum of $54,037.50 is provided for herein, the Clerk of this Court shall mark this Judgment as having been satisfied, upon the payment of all Court costs by the Plaintiff, the Department.

5.      The Department shall grant a right of encroachment for the placement of signage at the location as shown on Exhibit A hereto within fourteen (14) days of Snapfinger

producing to the Department evidence of a right of ownership or permission for the owner of the area to place the agreed signage.

SO ORDERED, this _____ day of _____, 2010

_____
Judge, Superior Court of Dekalb County

**CONSENTED TO BY PLAINTIFF:**

THURBERT E. BAKER
Attorney General

RAY O. LERER
Senior Assistant Attorney General

_____
KENNETH L. LEVY
Special Assistant Attorney General
ZACHARY & SEGRAVES, P.A.
1000 Commerce Drive
Decatur, Georgia 30030
Attorneys for the Plaintiff-Condemnor
404-373-1685

**CONSENTED TO BY DEFENDANTS:**

_____
MORRIS, MANNING & MARTIN, LLP
Jason P. Wright
1600 Atlanta Financial Center
3343 Peachtree Road, NE
Atlanta, Georgia 30326-1044
Attorneys for Snapfinger Plaza, LLC
404-504-7734



5

**EXHIBIT C**
(Outparcel)


All that tract or parcel of land lying and being in Land Lot 126 of the 15th Land District of DeKalb County, Georgia and being more particularly described as follows:

Beginning at a point marked by a right of way monument along the northeasterly right of way of Snapfinger Road, as said Snapfinger Road right of way was reconfigured by virtue of condemnation proceedings identified as DeKalb County Superior Court Civil Action 08CV2512-2, said right of way monument being located at a point along the easterly boundary of the property now or formerly of Joseph and Gladys Grimaud and being approximately 160 feet east-southeasterly from the easterly right of way of Wesley Chapel Road; running thence north 4 degrees 14 minutes 21 seconds west a distance of 71.32 feet to a point; running thence north 87 degrees 19 minutes 14 seconds east a distance of 256.37 feet to a point; running thence south 2 degrees 40 minutes 46 seconds east along the boundary with property now or formerly owned by Golden Glide, Inc. a distance of 175.58 feet to a point; running thence north 88 degrees 35 minutes 21 seconds east a distance of 25.25 feet to a one-half inch rebar found; running thence south 3 degrees 38 minutes 38 seconds east a distance of 57.54 feet to a point located along the relocated northeasterly right of way of Snapfinger Road; running thence north 62 degrees 37 minutes 44 seconds west a distance of 324.22 feet to the Point of Beginning, as shown on boundary/as-built and topographic survey for Snapfinger Plaza, LLC prepared by Diversified Technical Group, LLC, Dacula, Georgia, Jay Scott Smith, Georgia Registered Land Surveyor dated March 22, 2010 (Project No. 10103).


Exhibit C to Exhibit I
Decatur, GA #500160


15





Exhibit D to Exhibit I
Decatur, GA #5016001